[Civ. No. 33731. Second Dist., Div. Five. July 27, 1970.]

HARRY JULIAN FINK, Plaintiff and Appellant, v. GOODSON-TODMAN ENTERPRISES, LTD., et al., Defendants and Respondents.

998

[redacted]

**COUNSEL**

Johnson, Robertson, O'Sullivan & Ladenberger and Don A. Ladenberger for Plaintiff and Appellant.

Trippet, Yoakum & Papiano and F. B. Yoakum, Jr., for Defendants and Respondents.

## Opinion

**REPPY, J.**—This is an appeal from a dismissal judgment issued after a declination by plaintiff-appellant (hereinafter, plaintiff) to amend following the sustaining of a general demurrer interposed by defendants-respondents (hereinafter, defendants)[1] to counts for (1) breach of an express contract requiring payment of damage-type compensation for production of a television series based upon the whole or any material part of a synoptic "presentation" made by plaintiff to defendants, (2) breach of implied contract calling for reasonable value compensation if defendants produced a series based on the whole or any material part of plaintiff's presentation, (3) breach of defendants' fiduciary (quasi-contractual) obligation never, without plaintiff's consent, to make use of the whole or any material part of plaintiff's presentation, resulting in destruction of its value, (4) infringement of plaintiff's common law copyright interest in his presentation resulting in destruction of its value, and (5) fraudulent preclusion of plaintiff from vending his presentation to other producers, resulting in damages equivalent to its reasonable value.[2]

Pursuant to section 426, subdivision 3, Code of Civil Procedure, the trial court had before it, as if part of the pleading: (1) plaintiff's "Presentation" explaining the central theme and the nature, form and content of the proposed television series, giving the time and place setting, a biographical and character sketch of the hero and some information about the other characters in the series, and presenting a plot summary for 15 of an apparently intended series of 39; (2) the full script and production ingredients for the initial episode of plaintiff's proposed program (designated "pilot script"); (3) a less pretentious "presentation"[3] authored by "Larry Cohen" upon which the allegedly offending series televised by defendants was based; and (4) some of the components of that series, to wit, the complete script for 7 out of the 39 individual episodes[4] and the script and song for a prologue for each episode.

A general review of this material at this point will lend understanding to

---

[1]Harris L. Katleman is alleged to be the agent of Goodson-Todman Enterprises, Ltd., a television producer.

[2]For convenience in consideration, we have altered the order of presentation of the counts from that present in the complaint. We have them in this order: one, two, five, four and three. Some of the counts contained allegations supportive of a claim for punitive damages, but that factor is not involved in the appeal.

[3]A writing designated "standard ending" seems to be classifiable as a part of the Cohen presentation.

[4]These seven episodes apparently were agreed upon by respective counsel as being representative of the entire group. In addition, the trial court viewed six out of the seven filmed teleplays, one film not being available. We have also viewed these six teleplays.

our more detailed summation of the various counts of the complaint and to our treatment of the judicial problems at hand.

### THE AUGMENTED PLEADING

Plaintiff's proposed program is called "The Coward." Its basic theme is the concept that a person who has undergone an experience which casts his courage in doubt, both to himself and others, may have a continuing compulsion to place himself in positions of peril and, by his conduct in meeting the dangerous circumstances, to prove to himself and others that he was and is not a coward, that he does have the attribute of courage. The hero is Dundee. His initial motivating experience occurs in World War II when, as a young lieutenant, he takes command of a company at the time his superior officer is killed. The commander had received orders from General Patton not to surrender, but before dying he directs Dundee to use his best judgment in the deployment of his troops. Although, after Dundee took over, Patton's order is repeated over a loud-speaker, under circumstances wherein resistance would have meant annihilation, Dundee surrenders his company, asking the enemy commander to honor the Geneva convention with respect to his men. The enemy commander acknowledges that Dundee acted in good faith, but he ignores the convention except as to Dundee as an officer, and has all of Dundee's men machine-gunned to death. Dundee is court-martialled. His attorney gets him acquitted on the technicality that his superior's direction had relieved him of the obligation of following Patton's explicit command, it being found inconsequential whether or not he had heard the Patton order or had made the surrender in an effort to save the men from annihilation. Afterwards, Dundee tells his attorney that he really did not know if he were guilty or innocent, but the attorney, dropping a nickel in front of Dundee, says, "[Y]ou're courage . . . is worth this much. . . ." The question of the validity of this aspersion rankles in Dundee's mind.

After the war Dundee becomes a police officer in Greenwich Village. The time setting for the depicted events is around 1960. Each episode finds Dundee involved in an encounter with crime, mostly murder. He conducts himself with daring and bravery. To remind himself of his psychological mission, he carries nickels and has the habit of tossing one away at the end of each exploit. Although he is admired by young recruits for his courage, there are those who know of his military experience and his reaction to it.[5]

---

[5]As brought out in the pilot script, when Dundee says to the widow of a fellow officer, whose death he is investigating, that he still has a pocket full of nickels, she says, "You don't have to prove yourself to me . . . or to your friends, and the rest of the world doesn't matter. . . ."

Another officer, led astray by the criminal element, with whom Dundee has a shootout, says, "I've always wondered about you and that thing in the war. . . ."

The motivating back story is briefly brought out in what is proposed as the signature for each episode, and it is fully depicted in a dream flashback included in the pilot script. In the presentation plaintiff indicates that through similar techniques the audience will be kept mindful of the back story and motivation for Dundee's conduct and attitude in the various episodes.

A segment of the presentation (and some of it was music) advises that music unique to "The Village" will be a strong factor in depicting the atmosphere of Dundee's area of operations; and it makes the comparative observation, incidentally, that "[t]he western has its 'ballad'."

The alleged offending series, which was telecast about five years after plaintiff submitted his proposed program to defendants, is called "Branded" (a title which plaintiff suggests means, when all is known, "branded as a coward"). The basic theme of the "Branded" series is the same as that of plaintiff's program. Its hero is McCord. His initial experience which ends up with him in perplexity about his courage occurs at a time when United States troops are battling American Indians in the early West. The company to which McCord is attached as a young officer comes under attack by a vastly superior force of Indians. McCord's commanding officer, who had had a distinguished career in the service, unfortunately has become senile. He does not appreciate the impossible odds; rather, in a dreamy trance of past exploits, he sees another glorious victory. When the situation is extremely desperate McCord, who out of devotion to his superior had been delaying the move, finally relieves him of command. Immediately thereafter the commander is killed. McCord starts a last-minute retreat, but it is too late. He is hit and put in a coma. The others are killed or are seriously wounded and ultimately die. McCord is the only survivor. He is court-martialled, apparently on the basis of a report by one of the dying men that he had run off from the affray. Out of respect for his beloved commander, he refuses to put up his only defense. He is found guilty. In the course of what is akin to an allocution he is stripped of military insignia and has his sword broken in front of him. The incident is publicized and McCord gets the reputation of being a coward. Although McCord is to be considered innocent in a sense, it is made known that he, himself, is not so sure. He feels that he did not have the inner courage to put the lives of the men above his concern for the reputation of his commanding officer. So, he is at least ambivalent about his courage and feels that he needs to prove to himself, as well as to others, that he has that attribute.

Each episode of "Branded" commences with a "signature" (or prologue), the scene of McCord being stripped of the emblem of his uniform and having his sword broken. The singing of a ballad is a prominent feature of

the prologue. It tells that it was false that McCord had run off from the battle, but that, although such abstention will mark him as a coward, he will never reveal the truth. McCord carries the hilt part of the broken sword with him, obviously as a reminder of his life's mission. It is featured in such a way as to remind the audience of McCord's motivation.

McCord becomes an itinerant cowhand in the western frontier. The various episodes involve him in circumstances of danger and combat, wherein, in one way or another, he displays virility and courage, at times by way of restraint, at times in ultimate counter-aggression.

In addition to the signature sequence of McCord being drummed out of the service, there are flashbacks in some of the episodes[6] to the Indian encounter by way of dream or recollection sequences.

The action details of the plots of the episodes in the two programs which are before us are not particularly similar,[7] however, in each, the hero achieves inner satisfaction in meeting another crisis bravely, countering his own concern about, and the reputation of, cowardice.

We return to a consideration of the basic pleading since it is its allegations, which are not superseded by the dramatic materials, which are under consideration.[8]

The first count is summarized as follows: On January 1, 1960, plaintiff was creator of the basic concept and production ingredients and plan of a television series denominated "The Coward." At defendants' special request (suggesting a preliminary indication by plaintiff that he had something available, causing defendants to solicit a conventional written presentation) on September 15, 1960, plaintiff submitted his written presentation and then on subsequent request his pilot script for "The Coward" to defendants pursuant to an express oral agreement, to wit, in consideration of plaintiff making said submission defendants promised that if they should televise a series "based on Plaintiff's Program or any material element contained in [it]," defendants would be obligated to compensate plaintiff in a certain specified manner.[9] In reliance, plaintiff submitted his program.

---

[6]In, Leap Upon Mountains; Vindicator; and Salute the Soldier Briefly.

[7]See later reference in footnote 20.

[8]There is considerable repetition of material in the respective counts as pleaded, by reference and otherwise. So that repetition or reference may be avoided, we ask that the material in any given count which by context is clearly relevant to another count be deemed included therein. We omit from our summary of any given count material which appears not to be significant to it.

[9]Pay reasonable royalties for the primary run (of the so-based television series) and for a certain number of reruns, a percentage of receipts from exploitation of the series through sales of books, records and merchandise, a reasonable percentage of net profits, a reasonable fee for services in connection with the script and for develop-

Thereafter defendants asked for and plaintiff sold them an exclusive option to acquire it. Throughout the 1965-1966 season "Branded" was televised by defendants. It is based on, uses and embodies, and substantially copies plaintiff's program. A written presentation of "Branded" was submitted to defendants by Larry Cohen. None of the agreed compensation has been furnished.

The second count, of course, omits reference to an express contract and indicates that when plaintiff submitted his program to defendants it was for the purpose of selling it, that he expected that he would be paid the reasonable value thereof should defendants produce a series based on plaintiff's program, or any material element contained therein, and that defendants knew all of this in requesting and receiving said submission.

Plaintiff's fifth count is summarized as follows: Plaintiff was, and is, a well-known, highly compensated and successful author of literary properties for the motion picture and television industries. Basic television concepts, characterizations and production ingredients and plans are of great value and are customarily submitted to producers through the medium of written presentations. Prior to September 15, 1960, plaintiff embodied the program of which he was the creator into such a written presentation. A fiduciary relationship arose between plaintiff and defendants in that plaintiff on September 15, 1960, submitted his program in confidence to defendants, at their special request and in reliance on the understanding that defendants would never make use of it, or any material element of it, without consent of plaintiff. Defendants accepted the submission on that understanding. During the period from September through November 1960 plaintiff conferred with defendants with respect to his program. On November 2, 1960, defendants requested, and plaintiff granted, an option giving said defendants the exclusive right to acquire plaintiff's program. Defendants' broadcast of the "Branded" series was without consent of plaintiff, in breach of the fiduciary arrangement, destroyed plaintiff's program, and caused him damages in the reasonable value thereof.

Plaintiff's fourth count is summarized as follows: Continuously since September 15 plaintiff has been the sole and exclusive owner of his program and the concrete embodiment thereof in its written form. At no time did plaintiff publish same, and plaintiff has retained his common law rights of ownership. At the special request of defendants, on September 15, 1960, plaintiff submitted to them his written presentation of the valuable type and thereafter his pilot script. He had conferences with defendants about them and granted defendants the exclusive option to acquire them. Defendants' broadcast of the "Branded" series, of which plaintiff was unaware

ing a so-called package and to give plaintiff the customary "created by" credits for each episode. Monetary figures for reasonable values were given.

was with knowledge of, and in disregard of, plaintiff's rights and destroyed the value of plaintiff's program so that he incurred damages amounting to the reasonable value thereof.

Plaintiff's third count is summarized as follows: Plaintiff was, and is, a well-known, highly compensated and successful author of literary properties for the motion picture and television industries. When plaintiff submitted to defendants his written presentation of the valuable type and, thereafter, his pilot script, he expected to be paid commensurate with its reasonable value should defendants televise a series based on it. Defendants knew all of this and requested, and accepted, the submission with that understanding. In November 1960 defendants falsely and fraudulently represented to plaintiff that they had decided not to televise a series based on plaintiff's program for the reason that they had decided that a saleable television series could not be made from it. Said representations were made with the intent to deceive plaintiff and to induce him in reliance thereon to, and in such reliance plaintiff did refrain from further efforts to market his program through any other television producer, which he otherwise would have done. By reason thereof, plaintiff has incurred damages to the extent of the reasonable value of his program and the television credit he would have had.

## THE RULING

In its minute order sustaining the demurrer the trial court observed that: "After viewing the series and reading . . . all exhibits the Court finds that by comparing the plaintiff's script [and] presentation . . . [with] the defendants' television series . . . , there appears to be no suspicion of copying or reproduction. It appears to this Court that if an impartial reader or viewer compared the work, he could not say that the plaintiff's works and the defendants' television series were in any respect similar or that there was a suggestion of similarity." Leave to amend, however, was granted; as indicated, plaintiff declined to do so.

## THE CONTENTIONS

Specifically, plaintiff contends (a) that the trial court committed error in (1) not comparing the Cohen presentation with plaintiff's presentation, (2) not considering the "Branded" prologue, (3) finding that there was no similarity between the respective works, and (b) that section 426, subdivision 3, Code of Civil Procedure is unconstitutional as special legislation violating the privileges clause of the Fourteenth Amendment of the United States Constitution and the uniform-operation-of-laws clause of the state Constitution. Inferentially, plaintiff is contending that important aspects of defendants' production were substantially similar to his program which is enough

to sustain the contract counts and that his program was of such elaboration as to make it protectible thus making the noncontract counts sufficient. He makes no strong appeal for his fraud count except to suggest that it could be amended into sufficiency.

## DISCUSSION

### 1. *Fraud Count*

■ We deal first with the fifth count since it appears to us to be entirely different in theory than the others. It is not for breach of a contractual obligation, for infringement of a common law copywright or for prevention of unjust enrichment. Essentially, it asserts that defendants should be liable in damages because they fraudulently induced plaintiff not to vend his program to other producers. However, its allegations are insufficient to state a cause of action. Plaintiff fails to allege (he now says by inadvertence) that defendants broadcast the "Branded" series; that their production had so much of the ingredients of his proposed program in it that the latter became of no value and now cannot be sold. He also fails to allege that his reliance on defendants' false representations about the saleability of his program (presumably by them to a sponsor) was justified. (*Seeger* v. *Odell,* 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291].) There is material in the pleading itself which suggests it was not, to wit, plaintiff's allegation that he is a well-known, highly compensated and successful author of literary properties for the television industry. As such, he certainly should have been able to evaluate the worth of his own product. (*Kahn* v. *Lischner,* 128 Cal.App.2d 480, 487, 489 [275 P.2d 539].) That his abstention from attempting to vend his program to others was in reliance on defendants' representations that his program was not saleable is a concept inconsistent with plaintiff's allegation that defendants bought from him the exclusive right to acquire his program. The announcement that the program was not saleable (to a sponsor) would not necessarily amount to an implied abandonment by defendants of their exclusive right, and no allegation is made that it should be so construed.

Plaintiff suggests that at least his inadvertent omission to allege the televising of "Branded" and its effect on plaintiff's program can be cured by amendment. However, plaintiff was given the right to amend by the trial court, and he elected not to use it. If there is any inclination of plaintiff to amend now, he should address himself to the superior court with a motion to set aside the judgment with respect to the third count and to thereupon be allowed to amend despite his previous declination. We express no opinion as to the procedural requirements or substantive merits of such a move.

## 2. *Other Counts*

Preliminarily we examine the two types of material involved, that of plaintiff and that of defendant. Their surface variation seems to call for a different type of treatment than is applied to the conventional infringement case.

Plaintiff's presentation is a plan for a television series. It obviously is not the final group of films ready to be shown (which is what defendants' material amounts to); it is not even a collection of the final scripts and directions from which the films could be shot.[10] But plaintiff's material is what might be termed a partial (but substantial) development of a fully worked out sub-theme toward a completely expressed television series, well calculated to give a clear insight to what the finished article would be like. It falls within what Professor Nimmer describes as the "middle ground," as to which a "new body of case law has begun to evolve." (Nimmer on Copyright, § 166, p. 716.) It is what has been called by recognized writers in the field a "spine idea" or an "elaborated idea." (See article by Robert Yale Libott in 14 U.C.L.A. L.Rev. 735 at pp. 742 and 769, referring to Stanislavski and Rubenstein, respectively.)[11]

The production of defendants, as indicated, consists of 39 filmed episodes of "Branded" shown to the television audience. However, the trial court had before it, and we have before us, only six of them in script and film form and another in script only (the film not being available) by reason of the stipulation of counsel. Apparently it was felt by both sides that this was sufficient to give the court insight to the whole and that the time and effort which would have to have been expended in examining the other 32 was savable. One thing that this agreed limited incorporation of dramatic material to the complaint does (and this gives answer in part to one of plaintiff's contentions) is to make it reasonable to consider the Cohen presentation (including explanations made in the standard opening) to the extent that it provides an inference of the use of the basic theme, as seen in the prologue and in the flashback and talisman references of the six viewed teleplays, in the 32 episodes not made available to the court.[12]

---

[10]The pilot script is in the latter category, but it is only one out of 39. Incidentally, if there had been substantial similarities between one of defendants' scripts and this one, we would have had the conventional infringement problem. However, none of the seven defense scripts put before the trial court by stipulation are similar in detail (only the presence of the underlying theme).

[11]For a general explanation of how the presentation (or format) is dealt with in the entertainment market place, see Libott's U.C.L.A. Law Review article starting at page 755 of volume 14.

[12]But because the Cohen presentation as such was not, of course, before the public, we do not think it available for consideration of its "fragmented literal similarities" (terminology developed by Professor Nimmer; see Nimmer on Copyright, § 143.12, pp. 627-631) which we feel bear only on the copying versus independent creation

Because the evaluation gauge is set by the pleaded terms of the alleged express or implied contracts, the test at the demurrer stage for the contract counts is suitably put in this trial court inquiry: whether, as a matter of law, it cannot be said that defendants have based their series on a material element of plaintiff's program.

Because of the difference in the level of literary expression in the two works, the test at the demurrer stage for the non-contract counts, we feel, is better stated in language different from that conventionally used in decisions and customarily referred to in textual treatment. (See Nimmer on Copyright, § 143, p. 619 et seq.) It is embodied in this trial court inquiry: whether, as a matter of law, it cannot be said that defendants have appropriated and used[13] a qualitatively important part of plaintiff's material in such a way that features discernible in defendants' work are substantially similar thereto.[14]

If the determination is favorable to plaintiff, then the trial fact finder, of course, will make the additional inquiry as to whether, despite the similarities that suggest such appropriation and use, the similarities are purely coincidental and, in fact, defendants' product was achieved independently of any use of plaintiff's material. (See Nimmer on Copyright, § 139.4, p. 605.)

issue which is for the trier of fact. There is a probable exception involved in the unjust enrichment-confidential relationship count covered *infra.*

[13]This seems to be more appropriate terminology in the dissimilar level comparison of the finished dramatic work with the elaborated idea than the conventional word "copied." (Compare exposition of conventional terminology in Nimmer on Copyright, § 141.2, p. 613, *et seq.*)

[14]At the demurrer stage, as to both the contract and non-contract counts, sometimes an initial inquiry is: given the type of access pleaded, whether there are sufficient indicators that a defendant's production was achieved by use of the plaintiff's material, as distinguished from being created independently, to allow that issue to go to the trial court fact finder; or whether such indicators are so meagre that it should be ruled as a matter of law that there was no such use. (See Nimmer on Copyright, § 138, p. 600.) There is intimation in the language of the trial court minutes that the latter was its view. It said, "[T]here appears to be no suspicion of copying. . . . [An impartial comparer] could not say that . . . plaintiff's works and . . . defendants' . . . series were in any respect similar or that there was a suggestion of similarity"; and it made no comment about nonprotectibility of plaintiff's material or a different approach as between contract and non-contract counts. However, as detailed in our treatment of the more substantial inquiries, there is ample similarity, given the unlimited access pleaded, to take the case beyond the demurrer stage with respect to such an initial inquiry. Less similarity is required where access is strong. (Nimmer on Copyright, § 143.4, p. 634; *Golding* v. *R.K.O. Pictures, Inc.,* 35 Cal.2d 690 [221 P.2d 95].) Moreover, we feel that it is proper to consider the Cohen presentation in this copying versus independent creation inquiry, and it had both "comprehensive non literal" and "fragmented literal" similarities (see footnote 12, *supra*). The latter were detailed by plaintiff in his brief.

As pointed out above, the gauge on the contract counts is keyed to the pleaded language (Nimmer on Copyright, §§ 173.1 and 173.2, particularly pp. 753-754 and 757; *Weitzenkorn* v. *Lesser,* 40 Cal.2d 778 [256 P.2d 947]; *Kurlan* v. *Columbia Broadcasting System,* 40 Cal.2d 799 [256 P.2d 962]) in this case, "[telecast] a . . . series based on Plaintiff's Program or on any material element[15] contained [therein]." This would be quite close to the concept of "inspiration for" which was the key to the upholding of an implied contract count in *Minniear* v. *Tors,* 266 Cal.App.2d 495, 505 [72 Cal.Rptr. 287].

"Based upon" does seem to be something a little different than having substantial similarity to a material element or qualitatively important part. The varying level of creation is clearly recognized. Probably the similarities would not have to be as pronounced, and the Cohen presentation should be considered available for part of the comparison material. Compare *Desny* v. *Wilder,* 46 Cal.2d 715, at page 743 [299 P.2d 257], where it is stated: "Obviously the defendants here used someone's script in preparing and producing their photoplay. That script must have had value to them." Even defendants, at the trial level at least, recognized this approach. In their points and authorities filed with their demurrer, referring to the express contract count, they said it must appear that defendants made substantial use of plaintiff's program and that this required a comparison with "defendants' works, which include Exhibit C to the Complaint . . . ." (the Cohen presentation).

There is no legal requirement that material must be of the protectible type to be the subject of a contract calling for compensation if another creates a work based upon it. This is because a contract creates no monopoly; it is effective only between the contracting parties; it does not withdraw the idea from general circulation or place a restraint on progress in art. (Nimmer on Copyright, § 169, p. 726; *Weitzenkorn* v. *Lesser, supra,* 40 Cal.2d 778.) Professor Nimmer observes that where an express contract exists, there is no justification for injecting the requirement of concreteness and novelty (the badges of protectibility), since the defendant has willingly contracted to pay (pp. 754, 757).[16]

---

[15]"Material element" could range from a mere basic theme up to an extensively elaborated idea, depending upon what might be proved as the concept of the parties. At this pleading stage we have no problem in considering that at least an idea elaborated to the extent found in plaintiff's material falls within that term.

[16]There seems to be some question whether protectibility is required in implied contract cases. Our approach is that in a given instance of implied contract the circumstances might be such that the factor of protectibility would be held involved (See Traynor dissent in *Stanley* v. *Columbia Broadcasting System,* 35 Cal.2d 653 [221 P.2d 73, 23 A.L.R.2d 216]); but it is clear that an implied contract can be such as to apply to unprotectible material. (See Traynor dissent in *Kurlan* v. *Columbia*

The contract counts in the instant case are silent as to the concept of protectibility. Since on general demurrer all intendments are taken favorably to the plaintiff, we adopt the premise that any material element under consideration as a basis for defendants' production does not have to be of a protectible nature. Professor Nimmer says, "A person may well contract to pay for the disclosure of a non-novel idea, and even if the contract does not expressly negate the requirement of novelty, it is not reasonable to assume that the [receiver] necessarily sought or expected novelty." (Nimmer on Copyright, § 173.2, p. 757.)

Even if it turns out that essentially the same similarity test is suitable for each theory of recovery, one would expect an initial consideration of the differentiation in terminology, to be certain that a common evaluation was appropriate. It appears that the trial court may not have made this study and that it arbitrarily applied the substantial similarity (rather than a "based upon") test to the contract as well as the non-contract counts. If this is the case, it is also likely that it made protectibility[17] a requisite for both. This was wrong insofar as the contract counts are concerned.

The right of plaintiff's work to protection by reason of sufficient novelty and elaboration of the accessible idea is a prequisite, of course, in the common law copyright count and also, we feel, in the unjust enrichment-breach of confidence count. This is because they are not based upon, and

---

*Broadcasting System,* 40 Cal.2d 799 [256 P.2d 962]; *Weitzenkorn* v. *Lesser, supra,* 40 Cal.2d 778, *Minniear* v. *Tors, supra,* 266 Cal.App.2d 495. Nimmer on Copyright, § 169, p. 726, and 15 Bulletin of the Copyright Society of U.S.A., pp. 265 et seq.) This is particularly true on a demurrer inquiry when it is pled, as here, that the defendant solicited the presentation of the plaintiff. " 'The person who can and does convey a valuable idea to a producer who . . . solicits the service . . . knowing that it is tendered for a price should . . . be entitled to recover.' " (Nimmer on Copyright, § 170, pp. 734.3-735, quoting *Desny* v. *Wilder,* 46 Cal.2d 715 [299 P.2d 257].) In addition in the instant case we have the pleaded circumstance of conferences on the presentation. Professor Nimmer suggests that if an implied contract is regarded as an agreement to pay for the disclosure of an idea rather than the idea itself and a defendant has requested that the plaintiff disclose his idea, such request implies a promise to pay for the disclosure if defendant uses the idea. (§ 170.4, p. 740, and § 173.2, pp. 757-758.) He feels this is the view in California. (§ 173.1, p. 755, citing *Chandler* v. *Roach,* 156 Cal.App.2d 435 [319 P.2d 776]; *Donahue* v. *Ziv Television Programs, Inc.,* 245 Cal.App.2d 593 [54 Cal.Rptr. 130], and *Minniear* v. *Tors, supra,* 266 Cal.App.2d 495.) He suggests that the Court of Appeal in *Henried* v. *Four Star Television,* 266 Cal.App.2d 435 [72 Cal.Rptr. 223], wrongfully affirmed the sustaining of the demurrer to the implied contract count. (P. 104, 1970 Supp. for p. 760.) There was enough similarity (both heroes traveled in chauffeur-driven Rolls Royces) and protectibility was not needed.

[17]In its explanatory minute order, the trial court did not speak specifically of the protectibility element, but its reference to the jointly used word "coward" as being commonplace and its inference that both heroes having been in the army (a not unusual affiliation) was insignificant suggests that it had that factor in mind.

so do not have the limitations of, contractual promises. This is clear as to the common law copyright situation, and brief contemplation reminds us that the function of a quasi contract (despite the somewhat misleading concept of that second word) "is to raise an obligation in law where in fact the parties made no promise." (Nimmer on Copyright, § 168.1, p. 722; and § 171, p. 747, citing *Thompson* v. *California Brewing Co.,* 150 Cal. App.2d 469 [310 P.2d 436].) It is not based on apparent intentions of the involved parties; it is an obligation created by law for reasons of justice. (*Weitzenkorn* v. *Lesser, supra,* 40 Cal.2d 778, 794.) The scope of common law copyright and quasi contract "reaches and renders liable persons other than the limited number who may have consented to a contractual relationship." (Nimmer on Copyright, § 168.2, p. 724.) There is the danger of monopoly and restraint on progress in art.[18]

Except for the one variation suggested above, essentially we have the same quest for the same points of similarity and the same analysis as to quantitative and qualitative factors in both the contract and noncontract counts. Initially we note that ". . . the determination of the extent of similarity which will constitute a *substantial* and hence infringing similarity presents one of the most difficult questions in copyrght law, and one which is the least susceptible of helpful generalizations." (Nimmer on Copyright, § 143.1, p. 619;—italics in original.) Because of the difference in the preparation level and the type of literary expression of the two words (presentation vis-à-vis final product) the most feasible way to look for substantial similarity is to "look through" what we have of defendants' production and determine whether we can find a "spine"[19] of structural dimensions similar to plaintiff's material, and, if we so find it, compare it with plaintiff's program. (See 14 U.C.L.A. L.Rev. 735, 762; compare with the different media concept—*ibid.,* p. 748.)

Such a "structural spine" is apparent in the "Branded" series. To enable us to recount the results of comparison we outline briefly of what plaintiff's

---

[18]Perhaps when to unjust enrichment there is added the feature of confidential relationship (as was done in our case) a limitation is created and there is less reason to make protectibility a prerequisite; but as Professor Nimmer points out, although the creation and breach of a confidential relationship is often incorporated in an unjust enrichment count and enrichment through violation of fiduciary status can be characterized as unjust, there can be unjust enrichment where disclosure was not confidential. (Nimmer on Copyright, § 168.1, p. 722.) As to the latter type, protectibility is essential. In our case, despite the assisting presence of pleaded confidentiality, as it turns out, we need not forego the requirement of novelty and elaboration.

[19]It might or might not be equivalent to the Cohen presentation, but if it turned out to be, it seems reasonable to note similarities between the two presentations for the "based upon" test for the contract counts and for inference of delivery of plaintiff's material to Cohen in breach of trust.

"spine" idea is composed as indicated more fully in the fact recital: (1) the basic theme that one whose courage has been put in doubt to himself and others will act to remove that doubt; (2) a detailed exposition (through the combination of the presentation and pilot script) of the back story, the hero's military experience wherein his courage was tested; (3) the plots for 15 of an estimated 39 weekly episodes; and (4) the portrayal techniques of (a) introducing the back story through a dream sequence in the first episode, (b) building and re-focusing attention upon it by flashbacks in succeeding episodes, (c) using the signature and talisman devices to keep the audience reminded of the central theme, (d) tying the surface plots of the individual episodes into and having them play upon the back story, and (e) making music a significant feature of the series by having it create atmosphere or tell part of the story. In sum, it is a combination of factual features and portrayal techniques.

The basic theme (sometimes called a general truth, eternal verity or super objective; see 14 U.C.L.A. L.Rev. 735, 742) of the two works (the psychological compulsion explained above) is strikingly similar. We find the back stories of each work substantially similar and story similarities are the key to infringement recovery. (14 U.C.L.A. L.Rev. 735, 740.)[20] In each it is a military experience which tests the hero's courage; he is a young officer; he takes over command because of the disability of his superior; his men are killed; appearances to authorities are such that court martial ensues; the trial helps tell the story and is the vehicle which crystalizes the unfavorable opinion of others (there is a conviction in one, only a technical acquittal unconvincing to the hero's own lawyer in the other); the hero emerges troubled by the appearances and his own doubts. It is true that there is a dissimilarity in the crisis which prompts the hero's action and, perforce, in the action taken, and that there is variation in the setting of time and place (World War II in Germany vis-à-vis early-day Indian skirmishes in the American West), but the fundamentals are the same. "It is entirely immaterial that in many respects plaintiff's and defendant's works are dissimilar if in other respects similarity as to a substantial element of plaintiff's work can be shown." (Nimmer on Copyright, § 143.2, p. 632.) Actually the variations are such as might be deliberately contrived to dis-

---

[20]We respectfully suggest that the trial court was not accurate, from the standpoint of the back story, in saying in its minute order that the "occupation and conduct of the principle characters, . . . [the] themes . . ., sequence and subject matter are not in any way similar."

There is no contention of substantial similarity of surface plots in the respective weekly episodes except, perhaps, as to the bounty hunter concept as it emerges in "Pictures in the Post Office" and "The Bounty." The use and treatment by each author is quite different, but the presence of this fairly unique theme in an episode in each series would probably have a bearing on the copying issue at trial.

guise piracy, although the western setting may well be considered as derived from plaintiff's own observations in his presentation: "[A] series taking place today . . . but with all the impact . . . of a good 'western.' . . . [Life] was dull compared to the . . . tensions, the demands, the violence of the Old West."

A change in setting can be ignored. (Nimmer on Copyright, § 143.11, p. 623, and § 173.1, pp. 752-753, where author refers to *Liggett & Myers Tobacco Co.* v. *Meyer,* 101 Ind.App. 420 [194 N.E. 206], dealing with situation wherein tobacco company changed the scene in ad from two men in working clothes or hunting togs to two golfers; see also *Davies* v. *Krasna,* 245 Cal.App.2d 535 [54 Cal.Rptr. 37], wherein a change of hero's association with F.B.I. to one with O.S.S. (Office of Strategic Services) became an immaterial dissimilarity.)

Because of the common motivation of the main character in each dramatic work, it is a person with much the same character, reactions, and attributes who engages in the various courage testing adventures in each one. (Compare the difference in character of the principles noted by the court in *Ware* v. *Columbia Broadcasting System,* 253 Cal.App.2d 489 [61 Cal.Rptr. 590], one being happy and the other morose and morbid.)[21]

These are strictly factual equivalents. There are also portrayal technique similarities. (1) The use of a signature segment in each episode to highlight the central theme and back story. In "The Coward" it is a brief verbal explanation. In "Branded" it is a depiction of the stripping of military insignia, coupled with the singing of the story-telling ballad. (2) The device of initiating and developing the back story in the early episodes. In "Branded" it is dramatized in the first six teleplays. In "The Coward" we know it is in the first and to be emphasized in those to follow. (3) The general plan of keeping the back story the underlying feature of each episode and of having each exploit it so as to increase audience appeal. (4) The use of dream and recollection sequences, verbal references and the talisman (nickels vis-à-vis broken sword) device to accomplish the purpose of such plan.

It is in no way fatal that there are some parts of plaintiff's elaborated idea as to which similarities are not found in the envisioned "spine" of defendants' production. For example, the surface plots of individual epi-

---

[21]It is probably no coincidence that "Branded" ended up with its hero given a Scotch name (McCord—originally two other names were used) as was the principle in "The Coward" (Dundee). It is somehow illustrative of the similar type of man each work desired to characterize.

sodes or the use of a second signature.[22] "[E]ven if the similar material is quantitatively small, if it is qualitatively important [particularly as to the original work] the trier of fact [and a fortiori the trial court on demurrer] may properly find substantial similarity." (Nimmer on Copyright, § 143.12, p. 629.) The combination of fact features (chiefly the back story) and of the portrayal techniques listed above actually is the major part of plaintiff's program. It is thus both quantitatively and qualitatively significant to the work. The equivalent features found in defendants' production are qualitatively important to it.

Bearing in mind the unlimited access pled in this case and the rule that the stronger the access the less striking and numerous the similarities need be, we feel that the combination of factual and technical equivalents described above are sufficient to preclude a determination (in the language of the tests we preliminarily spelled out) that, as a matter of law, it cannot be said that defendants based their series on a material element of plaintiff's program or that defendants have appropriated and used a qualitatively important part of plaintiff's material in such a way that features discernible in defendants' work are substantially similar thereto.

Since the contract counts do not have the prerequisite of protectibility, this means that the demurrers thereto should not have been sustained but should have been overruled. ▇ With respect to the noncontract counts, there remains to examine the question of whether the combination of factual and technical elements of plaintiff's program, as to which we found discernible features in defendants' production to be substantially similar, warrant protection. This matter (novelty and concreteness), incidentally, as distinguished from originality, appears to be a question of law, the decision as to which will be controlling at trial. (Nimmer on Copyright, § 138, p. 599 and inferred from *Weitzenkorn* v. *Lesser, supra,* at p. 787.)

It is said that in this middle area " 'Decisions must . . . inevitably be *ad hoc.*' " (Nimmer on Copyright, § 143.11, p. 622, quoting Judge Learned Hand.) Mr. Libott describes the area as the "zig-zag frontier." (14 U.C.L.A. L.Rev., 740, 743.)

Clearly protection is not afforded to a mere abstract idea, what we have referred to as an eternal verity or super objective, such as: eternal youth is no panacea (*Weitzenkorn* v. *Lesser, supra*); inanimate objects can give solace to humans (*Ware* v. *Columbia Broadcast System, supra*); or, one whose courage is cast in doubt will act to vindicate himself. But along the road to a fully expressed dramatic work there are selective developments

---

[22]The depiction of Dundee training recruits, affording an opportunity to present his personality and accomplishments to the audience.

which achieve the standard for protection; in California, "the representation of a composition in art." (Civ. Code, § 980, subd. (a).) This is suggested in *Gethers* v. *Blatty,* 283 F. Supp. 303, at page 305, wherein it was held that the protectible portion of a work encompasses "the *development* [and] *treatment* . . . of such elements as theme, . . . situations, . . . bare basic plots and . . . characters." (Italics added.) Professor Nimmer cites *Donahue* v. *Ziv Television Programs, Inc., supra,* 245 Cal.App.2d 593, for the proposition that "copying may be inferred from the fact of *similarities* of expression or *development.*" (Nimmer on Copyright, p. 104 of 1970 Supplement for p. 758 of text.) (Italics added.)

Further, just because the element of "originality [novelty]" is small within the expanse of "free ideas" and "common techniques," it cannot be said as a matter of law that it is not protectible. (*Stanley* v. *Columbia Broadcasting System, supra,* 35 Cal.2d 653, 672; *Davies* v. *Krasna, supra,* 245 Cal.App.2d 535; 14 U.C.L.A. L.Rev. 735, 760.) The combination of factors under consideration is not a small part of plaintiff's program, but it is partial. A significant aspect of this portion is that it contains the plan for an entire series, the full back story,[23] the molding of an important part of the hero's character and personality, the method for presenting and recapturing the back story in the sequential episodes, and various portrayal techniques as to all of which there are substantial similarities. This combination is quite comprehensive, has some sophistication and a good degree of cohesion. It is not likely that defendants would have produced their end product if plaintiff had not authored and supplied his elaborated idea. (See article in 14 U.C.L.A. L.Rev., 735, 741-742, referring to a concept of Rubenstein.) Certainly having plaintiff's presentation to analyze would have made it easier for Cohen and his staff to compose "Branded" than if defendants simply had given him the basic theme and told him to create a series. This composite we feel has sufficient concreteness and novelty to be classified as protectible.[24]

Plaintiff has alleged and the decisions and texts recognize that the presentation (or format) is an important item in the entertainment field. Professor Nimmer points out that many radio formats have been held protectible. (Nimmer on Copyright, § 167, pp. 718 et seq.; 14 U.C.L.A. L.Rev. 735-759.) In *Desny* v. *Wilder, supra,* 46 Cal.2d 715, at page 731,

---

[23]The circumstance that the alleged infringement relates mainly to the back story itself and its influence on the sequential episodes and that much original work by defendants was superimposed upon what allegedly was taken from plaintiff's program, can be dealt with at the trial in the area of damages. (14 U.C.L.A. L.Rev., 735, 771-772.)

[24]Libott notes that variety is infinite; what has some resemblance to the standard pattern can be novel. (14 U.C.L.A. L.Rev., 735, 755.) Also, variety in the use of standard patterns can make for novelty.

the court said: "The theatrical producer . . . may be dependent for his business life on the procurement of ideas from other persons . . .; he may not find his own sufficient for survival."

The back story is nearly a fully expressed composition on its own. It is a "sequence of events by which the author expresses his theme or idea" and develops a major character. This is essentially what Professor Nimmer suggests is "a guide to decision which avoids the abdication of reasoned analysis implicit in the conclusion that nothing more can be said than that each case turns on its own facts." (Nimmer on Copyright, § 143.11, pp. 623, 625-626.) The various other features taken separately might be commonplace, but taken in combination with each other and the back story, they are not.

In the instant case there appears to be considerably more similarity between the respective back stories, reaching into development of the details (which is enhanced by the equivalence in method of exploitation in the series and in portrayal techniques), than there was in the two Tarzan-Fountain-of-Youth stories where it was limited to the subject matter of the basic theme (even the theme itself was variable—eternal youth is not a blessing vis-à-vis eternal youth is a reward for good) which circumstance survived the contract but not the common law copyright test. (*Weitzenkorn v. Lesser, supra.*) About the same can be said of "Sea Divers" and "Sea Hunt." (*Minniear v. Tors, supra,* 266 Cal.App.2d 495, 500.) *Desny, supra,* is quite different. There was only a three-page presentation of limited scope, and the defense work was not a series. In *Davies v. Krasna,* 245 Cal.App.2d 535 [54 Cal.Rptr. 37], where a nonsuit on a breach of confidential relationship count (which presumably required protectibility as a prerequisite) was reversed, the novelty and elaboration (12 outlines) were certainly no greater than in the instant case.[25]

Two factors present in the instant case (particularly the second to be mentioned) appear to dispositively differentiate its noncontract counts from those held in other cases to have involved nonprotectible matter. First, it is to be inferred from the pleading that defendants had Cohen make up his presentation from that of plaintiff. This shows either that they felt there was novelty in it, or that they wanted it despite lack of novelty. Secondly, plaintiff alleges that defendants made a special request to plaintiff that he sell to them, and on plaintiff's assent, they did then buy from him the exclusive right to use his program. This strongly indicates a viewpoint (sufficient on demurrer) that plaintiff's program did have concreteness and novelty. The alleged report by defendants to plaintiff that his program was not saleable was, of course, also said to be false.

---

[25]Chiefly the plot that the husband, caught in a compromising position by his wife, pretends he is with the F.B.I. (O.S.S.) in order to divert her suspicions.

We believe that the peculiar facts of this case put plaintiff's program, at this pleading attack stage, in the protected category. Therefore, the demurrers to the noncontract counts also should not have been sustained but should have been overruled.

We tie a few strings hanging loose in the unjust enrichment—breach of confidence count.

██ Plaintiff alleged it was customary to submit presentations as he did. Consideration of custom is proper since it is relevant to the issue of whether or not any enrichment is unjust. (Nimmer on Copyright, § 168.1, p. 723; see also *Minniear* v. *Tors, supra,* 266 Cal.App.2d 495; see also *Davies* v. *Krasna, supra,* 245 Cal.App.2d 535, 546.)

As indicated, the trial court should have at least considered the Cohen presentation in aid of determining whether the pleading, as augmented, was subject to the inference that defendants had made plaintiff's program available to Cohen in breach of a fiduciary obligation. A producer who receives a work in confidence has the obligation to guard it. (*Davies* v. *Krasna, supra,* 245 Cal.App.2d 535, 549.)

We recognize that our decision will probably take its place in the so-called zig-zag frontier. We are aware of the feeling of certain leaders in this field that the idea-expression concept is outmoded and that making case-by-case decisions in the uncertain middle ground is not a true solution.[26] But it seems to us that this is not the court nor the case to be the progenitor of a redefinement of rules and policy.

## CONSTITUTIONAL QUESTION

As a result of our decision covering the ruling on the demurrers, it is unnecessary to pass upon the contention of the unconstitutionality of Code of Civil Procedure section 426, subdivision 3.

## DISPOSITION

The judgment is affirmed as to count 3 of the complaint; it is reversed as to all other counts.

Stephens, Acting P. J., and Aiso, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied September 24, 1970.

---

[26]Under the "all writings are protected but subject to fair use" concept proposed by Libott (14 U.C.L.A. L.Rev. 735, 769) plaintiff's presentation would be protectible and defendants' use of it, as pleaded, would be considered, at the demurrer stage, as unfair on the reasonable assumption that such use would tend to prejudice the sale of plaintiff's work.