Ralph C. **RICHTER** et al.,
Plaintiffs-Appellants,

v.

**WESTAB, INC.,** and the Mead Corporation, Defendants-Appellees.

No. 75–1348.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 10, 1975.

Decided Jan. 28, 1976.

John C. Robertson, Hardison & Robertson, Memphis, Tenn., Ronald M. Harkavy, Memphis, Tenn., for plaintiffs-appellants.

Timothy A. Ryan, Nelson, Norvell, Wilson, McRae, Ivy & Sevier, Memphis, Tenn., for defendants-appellees.

Before WEICK, MILLER and ENGEL, Circuit Judges.

WEICK, Circuit Judge.

The plaintiffs-appellants sued the defendants in the District Court to recover damages in the amount of $2,500,000, for breach of contract to develop a fashion design for loose leaf notebook covers and binders manufactured and sold by Westab, Inc., a subsidiary of Mead Corporation. Jurisdiction was based on diversity of citizenship, and the case is admittedly governed by Ohio law.

The case was tried before the District Court without a jury. The facts are set forth at length in the Memorandum De-

cision of the District Judge, and will be referred to only briefly here in our discussion of the issues.

Plaintiffs were partners in the firm of Richter & Mracky Design Associates, which created and developed designs for products and marketing concepts. In 1964 Mark Seitman, an employee of Richter & Mracky, observed that the school supplies industry was characterized by drabness and a lack of attractiveness in the various product lines. He believed that a school supply firm could improve its sales by using on notebook covers and binders fashion designs and fabrics which matched clothing being advertised in young women's fashion magazines; that such fashion-oriented supplies could be matched as a package so that the fashion-conscious buyer could purchase all items from one company; and that these lines of school supplies could be advertised in fashion magazines rather than in trade journals as had been the practice with school supplies in the past.

Seitman solicited Westab and arranged a meeting for February 10, 1965, with its officers. Westab was the largest manufacturer of school supplies in the country. At this meeting Seitman presented his concept, which resulted in authorization for Richter & Mracky to produce tentative designs and samples for presentation to Westab sales officials. During the meeting a Westab officer suggested that the notebook binders in the fashion line have interchangeable covers, and Richter & Mracky was also authorized to develop this idea.

After the meeting Seitman discussed with Edgar Stovall, Vice-President of Westab, the matter of compensation which included a royalty of five percent of Westab's sale price, to be paid on specific designs submitted by Richter & Mracky and used by Westab. It did not include royalties on the mere concept of fashion design.

During the summer of 1965 Richter & Mracky worked to perfect interchangeable binder covers and to produce fashion designs which it named "Fashion Goes To School." Samples were submitted to Westab. The interchangeable covers became loose when the notebook was opened, and were not practical. The "Fashion Goes To School" concept was submitted at a meeting of Westab's salesmen; it called for a retail price of $4.95 for the package.

None of the designs was acceptable to Westab, and the project was rejected in October 1965 when Westab marketing officials balked at the projected retail price of $4.95 for the package. Westab then paid Richter & Mracky for shop expenses and asked that the work product not be given to competitors.

The concept was then presented to Sears, Roebuck and Company by Richter & Mracky, proposing that the binders would be purchased from Westab. Westab agreed to furnish the binders, but Sears declined to purchase the concept.

In 1965 Westab's research and marketing personnel independently developed a package of school supplies with matching plaid covers, packed together in a transparent shrink wrapper, and called "Campus Mates." This package was a success. In 1967 Westab introduced paisley-patterned binder covers. In 1968 more paisley patterns and stripe patterns were introduced in the "Girl Talk" line, promoted by advertisements in the magazine *Seventeen*. In 1969 Westab coordinated binder fabrics with fashion trends in "The Wet Look" and "The Leather Look" lines. In 1970 the fashion binder lines were promoted in fashion magazines as clothing accessories: "Think of a notebook as something you wear"; "Westab's got notebook ensembles to go along with all those sharp new clothes you've just bought this fall." These fashion lines generated sales revenues in excess of $4.6 million in the years 1966–1969.

In 1969 Seitman first noticed that Westab's marketing strategy resembled the concept which he had presented to Westab in 1965. In 1971 the present suit was brought to recover five percent royalties on all sales by Westab of fashion-coordinated school supplies.

Two theories of recovery were presented: breach of express contract and breach of implied contract arising from the use of a trade secret. The District Court found that an express contract, partly oral and partly in writing, existed but had not been breached; that the contract did not contain the provisions claimed by Richter & Mracky; and that the concept could not be protected as a trade secret because it did not fit within the definition of a trade secret under Ohio law.

## THE EXPRESS CONTRACT

Richter & Mracky challenges the finding of the District Court that an express contract existed, the terms of which were not breached. This finding must be affirmed if supported by substantial evidence in the record, *Metropolitan Paving Co. v. City of Aurora*, 449 F.2d 177, 181 (10th Cir. 1971), and can be reversed only if clearly erroneous, Fed.R.Civ.P. 52(a), *Northeast Theatre Corp. v. Wetsman*, 493 F.2d 314, 317 (6th Cir. 1974).

■ If the contract called for Westab to pay a five percent royalty only on binders carrying specific designs furnished by Richter & Mracky no breach of contract occurred. There was substantial evidence to support the finding that the contract required Richter & Mracky to submit specific designs and to be paid only for use of the designs so submitted.

On cross-examination of Seitman the following exchange occurred:

Q Tell us what you said?

A How is this to be compensated for us, there is outside work, and you ask how it should be billed for it, and as far as the items that come from the concept Mr. Stovall had clearly said, and I had clearly said, that we would receive a royalty on them.

Q Let me ask you to do this. If you would, consider yourself a tape recorder, could you play back what you said to Mr. Stovall at that meeting of February 10, 1965 concerning the contract, and what you were to do?

A Let's take the next step as per the excitement, let's develop these products.

Q Is that what you said?

A Yes. You are asking what I said to the man.

Q Go ahead, tell all that you said to him.

A He said that we would receive a five percent royalty. I said we would develop the products that showed interest, that there was interest in, we would develop different approaches to the vision as you have expressed in it, as everybody was excited about, and on anything that is used we are to get five percent royalty, and on any work you ask us to do we should bill you outside costs.

That's what I said to him, and that's what he agreed upon. (A. 108–09)

This testimony supports the terms of the contract found by the District Court. In addition, the letters exchanged between the parties in April and May of 1965 can be fairly construed to indicate that a five percent royalty was to be paid for a particular line of binders called "Fashion Back To School," which was to be designed by Richter & Mracky, but which was rejected by Westab's sales managers in October. Finally, Stovall testified that the agreement made between himself and Seitman called for Richter & Mracky to be paid a royalty on sales of items designed by Richter & Mracky.

We conclude that the District Court's finding that an express contract existed calling for Richter & Mracky to be paid a royalty for specific designs submitted by them was supported by substantial evidence, including the finding that such contract was not breached. We further conclude that such findings were not clearly erroneous.

## THE TRADE SECRET THEORY

■ An alternate theory of recovery claimed was that an implied contract arises to pay for use of a trade secret when the secret is divulged as part of a

confidential relationship. Even if this principle is a correct statement of Ohio law it cannot create an implied contract in Ohio because the fashion coordinating concept is not a trade secret as defined in *B. F. Goodrich Co. v. Wohlgemuth,* 117 Ohio App. 493, 498–99, 192 N.E.2d 99, 104 (1963):[1]

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. * * *

■ This definition does not include a marketing concept or a new product idea. Trade secret law is designed to protect a continuing competitive advantage, which a company enjoys due to confidential information it possesses, from destruction due to disclosure by a departed former employee. A marketing concept does not by confidentiality create a continuing competitive advantage because once it is implemented it is exposed for the world to see and for competitors to legally imitate.

This conclusion is even more compelling because Richter & Mracky is asking for compensation to cover periods when fashion binders were widely sold on the market by Westab's competitors as well as by Westab. Even if Westab had been paying Richter & Mracky to use the concept, it would have ceased being a trade secret upon introduction of the products,

and Richter & Mracky thereafter would have no legal right to the concept.

Any competitive advantage to be gained from use of this concept would last only until a competitor could place similar items on the market. Richter & Mracky would have no remedy against Westab's competitors for their use of the concept.

Prior to sending samples to Westab plaintiffs had disclosed its concept to editorial personnel of fashion magazines, to potential suppliers of fabrics, and to an assistant professor of art at the University of California. When defendant declined to accept plaintiffs' "Fashion Goes To School" concept plaintiffs disclosed the alleged secret to Sears, Roebuck and Company.

## THE LEGAL PROTECTION OF IDEAS

We must recognize that firms which sell ideas as their product should be able to protect their right to ask for and to receive compensation for their products just as any other business can. These firms have traditionally been protected by patent and copyright laws. However, intangible concepts which are being sold by many consultants today cannot be protected by patent or copyright statutes.

■ Richter & Mracky suggests that legal protection is sometimes given to advertising slogans, marketing concepts, and television program concepts. This is true, but such relief is not found under the law of trade secrets. The logical means to protect a marketing concept is a tort action for conversion of intellectual property, or a quasi-contract action for wrongful appropriation of intellectual property.[2] Such a cause of action is quite rare in Ohio.

■ The general rule of law is that ideas are not the property of anyone under federal law unless patented or copy-

---

1. This definition is taken from 4 Restatement of Torts § 257 Comment b (1939).

2. These forms of action are discussed in Note, *Beyond the Realm of Copyright: Is There Le-* *gal Sanctuary for the Merchant of Ideas?* 41 Brooklyn L.Rev. 284 (1974); Swartz, *The Protection of Intangible Interests,* 49 Mass.L.Q. 107 (1964).

righted. *Lear, Inc. v. Atkins,* 395 U.S. 653, 668, 89 S.Ct. 1810, 23 L.Ed.2d 610 (1969).

■ If an idea cannot meet the requirements of patent or copyright laws which entitle it to protection, the states can not render such requirements nugatory by affording such ideas protection under state law. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). There are exceptions to this rule: state protection of trade secrets is considered to be not inconsistent with patent laws. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), (upholding Ohio law of trade secrets).

■ With respect to ideas which are colorably patentable the law seems clear that states are limited in their ability to protect items not meeting patent criteria. However, with respect to literary property the failure to meet the criteria for copyright protection does not necessarily preclude protection under state common law. This is particularly true of unfinished program concepts presented to the broadcast media. The reason for this toleration of state law copyrighting is that the federal copyright statutes antedate the development of modern marketing concepts and the broadcast media. The need for legal protection of unfinished marketing and broadcast program concepts has not been met by amendment of the copyright laws, so the common law has once again served to meet new legal problems by finding protection for such concepts. See *Note, Beyond the Realm of Copyright: Is There Legal Sanctuary for the Merchant of Ideas?* 41 Brooklyn L.Rev. 284, 297–302 (1974).

■ Ohio law recognizes the existence of a common law copyright which protects unpublished works from appropriation when exposed in confidence to another. *Ballard H. T. Kirk & Associates, Inc. v. Poston,* 33 Ohio App.2d 117, 119, 293 N.E.2d 102, 103 (1972).

■ Common law copyright protection has been held in other jurisdictions to protect not only polished manuscripts but also advertising slogans, *Liggett & Meyer Tobacco Co. v. Meyer,* 101 Ind. App. 420, 194 N.E. 206 (1935), and program concepts, *Fink v. Goodson-Todman Enterprises,* 9 Cal.App.3d 996, 88 Cal. Rptr. 679 (1970); *Silver v. Television City, Inc.,* 207 Pa.Super. 150, 215 A.2d 335 (1965); *Hamilton Nat'l Bank v. Belt,* 93 U.S.App.D.C. 168, 210 F.2d 706 (1953). However, when protection is to be afforded to a concept rather than to a specific expression, the concept must be both novel and concrete, *Fink v. Goodson-Todman Enterprises, supra; Thomas v. R. J. Reynolds Tobacco Co.,* 350 Pa. 262, 38 A.2d 61 (1944).

■ The idea of fashion-coordinated designs on binder covers does not appear to meet the test of novelty required in *Stevens v. Continental Can Co.,* 308 F.2d 100 (6th Cir. 1962). There the plaintiff's concept was to place a wood grain design on paper plates and cups. We held that even if wood grain patterns had never been used before on paper plates and cups the idea was not novel because the wood grain design was not novel. The idea of using a design on a particular item is abstract. The design to be used is concrete; but if the design to be used is not novel then no legal protection is available.

■ In the case at bar Richter & Mracky suggested that Westab apply to their school supplies designs already seen on clothing fashions. Since the designs to be used were not originated by Richter & Mracky, the suggestion lacks novelty according to *Stevens, supra,* and the idea that the designs be placed on binders, standing alone, also lacks concreteness.

■ While there is authority in other jurisdictions for permitting recovery on an implied contract theory for use of an idea which is neither novel nor concrete in the legal sense, *Blaustein v. Burton,* 9 Cal.App.3d 161, 88 Cal.Rptr. 319 (1970), an implied contract theory is inappropriate here because an express contract has been found to exist.

■ The law does not favor the protection of abstract ideas as the property of the originator. An idea should be free for all to use at least until someone is able to translate such idea into a sufficiently useful form that it may be patented or copyrighted. Thus competition in the use of ideas is a social good, hastening the process of invention.

■ When a design firm suggests that a particular product be decorated with thematic designs, this act of suggesting should not establish an exclusive right to exploit the idea. Perhaps the design firm will not be sufficiently competent to produce good designs based upon the concept. A concept is of little use until solidified into a concrete application. The idea of fashion designs is useless unless good designs are obtained. If the design firm is incapable of producing good designs the public should not be denied the benefit of the idea if another designer could produce good designs. Thus the principle denying legal protection to abstract ideas has important social interests behind it.

In spite of this policy, firms which specialize in selling abstract concepts may protect their work product by contract.[3] If Richter & Mracky had made a contract with Westab which required Westab to pay a royalty on all fashion binders sold by Westab, the contract would have been enforceable in the courts. Likewise, if the parties had made an agreement in advance of the meeting that any sale arising from the use of concepts presented at the meeting would require royalty payments to Richter & Mracky, the facts here would probably require a judgment for plaintiffs.

We doubt that Westab would ever enter into such a contract, preferring to hear the presentation, or to see the proposed designs, before agreeing to a contract for their use. Such action would merely reflect the fact that an abstract idea has little commercial value until translated into a specific utilization.

Here the contract between the parties called for Richter & Mracky to submit the specific designs called for in the concept, and to be compensated for their acceptance and use. Similarly, when those designs proved to be unsatisfactory, it was the design department of Westab which gave the idea commercial value by developing its own designs which would utilize the concept.

The abstract concept of fashion designs on binders was a sales tool for Richter & Mracky, not a product. Richter & Mracky wished to sell designs, not the concept. The concept was necessary to the firm because it enabled the firm to solicit contracts for the purchase of its designs from a new market, the manufacturers of school supplies. Richter & Mracky obtained value for the idea, and opened up a new market for its design services. However, its design services were not sufficiently superior to the skills of Westab's own designers to cause Westab to purchase Richter & Mracky's product. Westab's own designers produced designs which attracted a significant volume of business, and the company was rewarded by the market for its efforts. The public benefited from this system which permitted competition to develop the best utilization for an abstract idea.

Denying the existence of a legal interest in abstract ideas disclosed in confidence will not as a practical matter impede the flow of ideas between companies. In this case Richter & Mracky never intended to sell its concept of fashion binders; it intended to sell designs to the school supplies industry. The disclosure of the concept was made in soliciting a contract to design binder covers. This disclosure would have oc-

3. In *Brookins v. National Ref. Co.*, 26 Ohio App. 546, 160 N.E. 97 (1927), the defendant used a marketing promotion suggested by the plaintiff. The basis for recovery was a promise by the defendant to pay the plaintiff for use of the promotion. Because a contract could be found in those facts, the court did not apply the test of concreteness or novelty to determine that the plaintiff could recover; the right to recover existed in the promise to pay for the idea.

curred regardless of the legal status of the idea disclosed.

We do not find in the circumstances of this case any basis under which Richter & Mracky, or its members, would be entitled to compensation for use by Westab of the fashion design concept.

Affirmed.