TWENTIETH CENTURY FOX FILM CORPORATION, Plaintiff,

v.

MARVEL ENTERPRISES, INC., Tribune Entertainment Co., Fireworks Communications, Inc., and Fireworks Television (US) Inc., Defendants.

Marvel Entertainment Group, Inc., Plaintiff,

v.

Twentieth Century Fox Film Corporation, Defendant.

Nos. 01 CIV. 3016(AGS), 01 CIV. 3017(AGS).

United States District Court, S.D. New York.

Sept. 24, 2002.

Dale M. Cendali, O'Melveny & Myers LLP, New York City, for Plaintiff.

Jonathan D. Reichman, Kenyon & Kenyon, New York City, for Marvel Enterprises, Inc.

Steven H. Rosenfeld, Ohrenstein & Brown LLP, New York City, for Fireworks Communications, Inc. and Fireworks Television (US) Inc.

Maura J. Wogan, Frankfurt, Garbus, Kurnit, Klein & Selz, New York City, for Tribune Entertainment Co.

## ORDER

SCHWARTZ, District Judge.

Plaintiff Twentieth Century Fox Film Corporation ("Fox") commenced the above entitled action alleging breach of contract, copyright infringement and trademark infringement. Defendant Marvel Enterprises, Inc. ("Marvel") has filed counterclaims alleging breach of express and implied contract; trademark infringement, trademark dilution, false designation of origin; unfair competition; and copyright infringement. Before the Court is Fox's motion, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all of Marvel's counterclaims for failure state a claim upon which relief can be granted.[1] For the reasons set forth below that motion is granted. Also before the Court is defendants' joint motion for partial summary judgment with respect to Fox's breach of contract claim. For the reasons set forth below that motion is denied.

### Background

The factual background of this action is set forth in the Court's order dated August 9, 2001. *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., et al.,* 155 F.Supp.2d 1 (S.D.N.Y.2001) (*"Fox v. Marvel I"*). Familiarity with that order is assumed here.

Marvel's seven counterclaims arise out of three factual allegations that are largely undisputed. In its first counterclaim, Marvel alleges that Fox violated the confidentiality provision of the 1993 Agreement between Fox and Marvel by attaching copies of the Agreement to its First Amended Complaint. Fox does not dispute that it attached redacted copies[2] of the Agreement to its complaint, as well as to the instant motion, but maintains that such conduct did not violate the Agreement. Marvel's second, third, fourth, fifth, and sixth counterclaims all concern Fox's reg-

---

1. Marvel originally filed its counterclaims on September 6, 2001, and Fox filed the instant motion to dismiss in lieu of an answer on October 12, 2001. On October 26, 2001, Marvel filed its opposition to the motion. As part of its opposition papers, Marvel also filed an amended version of its counterclaims pursuant to Fed.R.Civ.P. 15(a). Since the parties agree that the amendments to the counterclaims are limited in nature and do not affect either side's arguments with respect to the instant motion (see Fox Reply Memorandum of Law at 1 n. 1; Letter of Jonathan D. Reichman dated October 26, 2001), the Court's decision addresses the Amended Counterclaims (referred to herein as "the counterclaims").

2. Such redaction deleted the specific financial terms of the Agreement. (See First Amended Complaint, Exh. D).

istration and use of several Internet domain names that contain the terms "x-men" or "xmen." [3] Marvel alleges that by registering and using those domain names, Fox disregarded Marvel's rights as the licensor of the "X–MEN" trademark and unlawfully altered the mark. Fox does not dispute that it registered and used the X–Men domain names but argues that such conduct was permissible under the 1993 Agreement. In its seventh counterclaim, Marvel alleges that Fox obtained copyright registrations for certain X–Men logos without properly informing the Copyright Office that such logos were based on Marvel's pre-existing copyrighted artwork. Fox does not dispute that it obtained copyright registration for its logos without identifying them as derivative of Marvel's copyrighted material. However, Fox asserts that its registrations are nonetheless valid because even if Fox had identified its logos as derivative of Marvel's artwork the Fox logos would have been copyrightable as derivative works.

## Discussion

### I. Fox's Motion to Dismiss Marvel's Counterclaims

#### A. Legal Standard

On a motion to dismiss, the Court must accept the factual allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507

U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (noting that factual allegations in complaint must be accepted as true on motion to dismiss); *Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 128 (2d Cir.2000) (same). In deciding a motion under Rule 12(b)(6), the Court may consider "facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint, as well as [ ] matters of which judicial notice may be taken." *Automated Salvage Transport, Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998). Further, mere conclusory allegations without factual support are insufficient to survive a motion to dismiss. *See De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996) (citations omitted) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."); *Lee v. State of New York Dep't of Correctional Servs.,* No. 97 Civ. 7112, 1999 WL 673339, at *14 (S.D.N.Y. Aug.30, 1999) (same); *Donohue v. Teamsters Local 282 Welfare, Pension, Annuity, Job Training, and Vacation and Sick Leave Trust Funds,* 12 F.Supp.2d 273, 279 (E.D.N.Y.1998).

#### B. Fox's Disclosure of the 1993 Agreement

 Paragraph 17 of the 1993 Agreement between Fox and Marvel reads as follows:

Fox and Marvel agree to take any and all reasonable steps to maintain the confidentiality of the terms of this Agreement; it being understood, however, that this Paragraph 17 shall not apply to any disclosures made for Fox's and/or Marvel's internal purposes or to any dis-

---

**3.** See Amended Counterclaims ¶ 13 (listing the domain names at issue, namely: www.x-menshop.com, www.xmendvd.com, www.x-menrom.com, www.x-menii.com, www.xmenvhs.com, www.x-menvhs.com, www.x-men2movie.com, www.x-meniinmovie.com, www.x-mentwomovie.com, www.x-mendvd.com, www.x-menspecialeditiondvd.com, www.x-menvideo.com, www.x-menlefilm.com, www.x-mentwo.com.)

closures which may be required by any applicable law, or by order or decree by any court of competent jurisdiction. The foregoing shall not preclude either party from releasing customary publicity concerning the existence of the Agreement provided that such publicity does not disclose the financial terms thereof. (See Declaration of Jennifer D. Choe ("Choe Decl."), Exh. 2 at 16). The parties disagree as to whether the purpose of this provision was to prohibit all unnecessary disclosures of the Agreement or simply to maintain the confidentiality of the financial terms. However, the Court need not answer this question of contractual interpretation because regardless of the precise meaning of Paragraph 17, it is undisputed that prior to Fox's attachment of the Agreement to the First Amended Complaint, Marvel itself attached a copy of the Agreement to a public filing in a bankruptcy proceeding. (See Choe Decl., Exh 3 (motions filed in *In re: Marvel Entertainment Group, Inc.,* No. 97–638(RRM), (Bankr.D.Del.))).[4] Such conduct precludes Marvel from maintaining its first counterclaim against Fox because Marvel cannot claim to have been damaged by the public filing of a document which Marvel itself had already placed in the public domain. And because damages are an essential element of any claim for breach of contract under California law,[5] *see Westways World Travel et al., v. AMR Corp.,* 182 F.Supp.2d

952, 963 (C.D.Cal.2001) (outlining the essential elements of a breach of contract claim under California law), Marvel cannot maintain a breach of contract claim against Fox for attaching a redacted copy of the Agreement to the First Amended Complaint. Accordingly, Fox's motion to dismiss Marvel's first counterclaim is granted.

### C. Fox's Registration and Use of the X–Men Domain Names

#### 1. Breach of Implied Contract

■ In its second counterclaim, Marvel alleges that Fox's conduct with respect to the X–Men domain names represents a breach of the implied terms of the 1993 Agreement. (See Amended Counterclaims ¶¶ 10–14). Specifically, Marvel claims that the 1993 Agreement implicitly recognizes that (i) Marvel is the owner of the X–Men trademark; (ii) all use by Fox of the trademark "inures to the benefit of Marvel"; and (iii) such usage is subject to the quality control approval of Marvel. (*Id.* ¶ 11). However, while the first two of these allegedly implicit contract terms may have been implicit in the 1993 Agreement, Fox's registration and use of the X–Men related domain names did not constitute breaches of those terms. The first of Marvel's implied contract terms simply restates one of the Agreement's basic premises, i.e. that Marvel is the owner of the X–Men trademark.[6] The second implied term merely

---

**4.** The Court takes judicial notice of Marvel's filing in the bankruptcy proceeding under Fed.R.Evid. 201. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991) ("courts routinely take judicial notice of documents filed in other courts, [...] not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") In taking judicial notice of Marvel's filings in the bankruptcy proceeding, the Court does not assess the truth of any assertions made in that proceeding, but merely recognizes the existence of those public filings.

**5.** In *Fox v. Marvel I,* the Court found that California law applies to the breach of contract claims brought under the 1993 Agreement. *See Fox v. Marvel I,* 155 Supp.2d at 13.

**6.** Fox does not specifically dispute the existence of this first implied term, and indeed Fox would be hard pressed to do so given the fact that Fox obtained a license from Marvel to use the X–Men mark in its films; if Marvel were not the owner of the trademark there would have been no reason for Fox to have obtained such a license.

restates a basic tenet of trademark licensing law, i.e. that when the goodwill associated with a trademark has not been transferred from a licensor to licensee, any goodwill developed by the licensee through its use of the mark inures solely to the benefit of the licensor. *See Fox v. Marvel I, supra,* 155 F.Supp.2d at 20–21 (quoting 2 McCarthy § 18:52 at 18–88). These two implied terms do not create any specific obligations or restrictions on Fox, and thus Fox's conduct with respect to the domain names does not constitute a breach of either term.[7]

The third contract term that Marvel claims to have been implied in the 1993 Agreement is an agreement that Fox's use of the X–Men trademark was subject to Marvel's "quality control approval." (Amended Counterclaims ¶ 11). However, Paragraph 6 of the Agreement grants Marvel "all rights in the 'X–Men' comic book series ... which Fox may require in order to produce, distribute, exploit, advertise, promote and publicize, ... in and by any and all manner, media, devices, processes and technology now or hereafter known or created, exclusively and in perpetuity, theatrical motion pictures" based on the X–Men comic books. (Choe Decl., Exh. 2 at 2). As the Court has already found, the language of this paragraph constitutes a broad grant of rights to Fox. *See Fox v. Marvel I,* 155 F.Supp.2d at 7. This grant of rights does not refer to any requirement which would subject Fox's use of the X–Men trademark to quality control approval from Marvel. The absence of any such express provision is especially telling given the fact that the 1993 Agreement does specifically require Fox to obtain Marvel's consent for *other* conduct. (See Choe Decl., Exh. 2 at 9 (providing that the grant of rights to Fox includes all

animated theatrical rights but also requires Fox to obtain Marvel's written consent before exercising such rights); *Id.* at 11–12 (providing that Marvel shall have approval rights over certain elements of Fox's X–Men film, such as "character integrity" and costumes)). Since the alleged requirement that Fox's use of the X–Men trademark was subject to Marvel's quality control runs counter to the express language of the Agreement, under California law the Court cannot infer the existence of such an implied term *See, e.g, Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co., Inc.,* 611 F.Supp. 415 (C.D.Cal.1985); *Stephenson v. Drever,* 16 Cal.4th 1167, 69 Cal.Rptr.2d 764, 947 P.2d 1301 (1997). Accordingly, the Court finds that the 1993 Agreement did not implicitly require Fox to obtain Marvel's approval of Fox's use of the X–Men trademark and thus Marvel cannot maintain a breach of contract action against Fox based on Fox's failure to have obtained such approval.

Marvel argues that its breach of contract claim should not be dismissed because "the Agreement grants Fox only those rights which it may *require* in order to exploit the X–Men theatrical motion pictures, [and] Marvel is entitled to prove at trial that Fox's promotion of the X-men motion picture did not *require* " Fox to register and use the domain names at issue. (See Marvel's Memorandum of Law in Opposition to the Motion ("Marvel Memo.") at 8 (emphasis in original)). However, such an assertion is based on an unreasonably literal reading of the Agreement. The Agreement does indeed grant to Fox "all rights in the X–Men ... which Fox may require in order to" promote its X–Men film (Choe Decl., Exh. 2 at 2), but it would be impossible for Fox to show

---

7. While Marvel's status as the owner of the X–Men mark could provide a basis to pursue some of its other counterclaims (trademark infringement, dilution, etc.), see *infra,* such status is not a contract term that could be independently breached by Fox.

that any particular marketing technique was in fact *required* for the promotion of the film. Marketing and promotion are not scientific or technical processes that necessarily require any specific conduct. Rather, these activities involve inherently subjective decisions as to which techniques will be most effective, and subjective judgments as to whether a particular technique was in fact successful. It is clear from the language of the Agreement, however, that the discretion to determine which marketing techniques should be used to promote the X–Men film resides with Fox. Thus, even though none of those techniques may have been absolutely necessary, Marvel cannot pursue a breach of contract claim based on Fox's use of marketing methods which Marvel claims were not *required* for the promotion of Fox's film. Accordingly, Fox's motion to dismiss Marvel's second counterclaim is granted.

## 2. Trademark Infringement

In its third counterclaim, Marvel alleges that Fox's registration and use of the X–Men related domain names constitutes trademark infringement in violation of 15 U.S.C. § 1114. (See Amended Counterclaims ¶ 15–19). Specifically, Marvel alleges that with respect to the domain names, Fox is an unlicensed third party and therefore Fox's registration and use of such domain names constitutes infringement. (*Id.* ¶ 17). Marvel concedes that under the 1993 Agreement Fox was entitled to market its X–Men films on the Internet (see Marvel Memo at 8), but argues that Fox was not permitted to register "altered" versions of the X–Men mark as domain names and then use those domain names

to promote other Fox properties aside from the X–Men films. (See *Id.* at 11).

■ This argument presents a threshold question, namely whether the domain names registered by Fox constitute altered versions of the licensed X–Men mark. The Court finds that they do not. The domain names at issue all contain the licensed X-men mark combined with different descriptive terms. (See n. 3, *supra*). These descriptive terms all relate to Fox's efforts to promote its X–Men films in various media. It is well-settled that the addition of descriptive terms does not alter a trademark such that a new mark is created. *See, e.g., Wella Corp. v. California Concept Corp.,* 558 F.2d 1019, 1022 (C.C.P.A.1977); *Nihon Keizai Shimbun, Inc. v. Comline Business Data,* 1998 U.S.Dist. LEXIS 6806, at *25–26 (S.D.N.Y. April 14, 1998). Therefore, a licensee's addition of descriptive terms to a specifically licensed trademark also does not change that mark or create a new mark. Thus, with respect to the domain names Fox remains a licensee of the X–Men trademark, not an "unlicensed third party" as Marvel alleges. (See Amended Counterclaims ¶ 17). Accordingly, Marvel, as licensor, cannot pursue a claim for trademark infringement against Fox, as licensee, based on Fox's addition of descriptive terms to the licensed mark—especially when those descriptive terms relate directly to activities specifically referred to in the 1993 Agreement.[8]

■ Nor does Fox's registration of the domain names in its own name, as opposed to Marvel's name, provide a basis for an infringement claim. As Marvel has con-

---

**8.** *Bunn–O–Matic Corp. v. Bunn Coffee Serv. Inc.,* 88 F.Supp.2d 914, 921 (C.D.Ill.2000) and *Digital Equipment Corp. v. AltaVista Tech., Inc.,* 960 F.Supp. 456, 473–75 (D.Mass. 1997), cited by Marvel in its brief, are distinguishable from the instant action. In both of those cases the licensees were granted only the right to use specifically enumerated marks. In the instant action, Fox was granted "all rights" necessary to produce and promote the X-men film. (Choe Decl., Exh. 2 at 2).

ceded, the Agreement clearly permitted Fox to market its X–Men films on the Internet. (See Marvel Memo. at 8). And as discussed *supra*, the Agreement granted Fox broad rights in the X–Men trademark and did not require that Marvel approve of Fox's use of the mark. Obtaining domain name registration is a necessary step in creating an Internet web site, and thus Fox's registration of the X–Men related names was clearly consistent with the Agreement. Finally, Fox's use of the domain names at issue cannot be the basis of a claim for trademark infringement because none of the web sites corresponding to those domain names overstep the boundaries of usage established by the 1993 Agreement.[9] Most of the web sites relate directly to Fox's first X–Men film or to its upcoming sequel. (See Choe Decl., Exh. 4; see also www.x-menshop.com, www.xmendvd.com, www.x-menvhs.com, www.xmenspecialeditiondvd.com (last visited September 23, 2002)). The use of such sites to promote the X–Men films cannot constitute trademark infringement because, as discussed *supra*, under the 1993 Agreement Marvel granted Fox the right to promote its X–Men films in "any and all media." (See Choe Decl., Exh. 2 at 2; see also 15 U.S.C. § 1114(1) (applicable only to those who act "without the consent of the registrant")).

■ At the time Fox's motion was filed, several of the domain names at issue connected either to Fox's main Internet site,

or are inactive sites (see Choe Decl., Exh. 4).[10] The domain names that were linked to Fox's general site cannot serve as the basis of a trademark infringement claim because such sites were not "likely to cause confusion, . . . cause mistake, or . . . deceive." 15 U.S.C. § 1114(1)(a), (b). Rather, to the extent that Internet users visited those sites—all of which had domain names related to the X–Men film sequel—and came to the conclusion that Fox was the source of that sequel, such conclusions would be correct. Thus, even if the use of such domain names was not permitted by the Agreement, Marvel could not establish a trademark infringement claim based on such use. Likewise, users who connected to the inactive X–Men web sites could not be confused, mistaken or deceived with respect to the X–Men trademark. Inactive links provide no information whatsoever, and thus they cannot create a mistaken impression regarding the ownership of the X–Men trademark. Accordingly, Fox's use of the X–Men related domain names provide no basis upon which Marvel can pursue a claim for trademark infringement and the Court therefore grants Fox's motion to dismiss Marvel's third counterclaim.

### 3. False Designation of Origin

■ In its fourth counterclaim, Marvel alleges that Fox's registration and use of the X–Men related domain names consti-

---

**9.** The Court takes judicial notice of the content of the web sites, all of which are incorporated by reference into Marvel's counterclaims. (See Amended Counterclaims ¶¶ 12, 17). In an effort to take into account all facts that could support Marvel's claims, the Court considers the content of the web sites at the time the instant motion was filed (see Choe Decl., Exh. 4), as well as on the date of this Order.

**10.** Currently, none of the domain names referred to in Marvel's counterclaims connect to

inactive web sites or to Fox's general site. (See www.x-menrom.com, www.x-meniimovie.com, www.x-men2movie.com, www.x-menii.com, www.x-mentwomovie.com, www.x-menvideo.com, www.x-menlefim.com, www.x-mentwo.com (last visited September 23, 2002)). However, because the domain names did at one time connect users to inactive sites or to Fox's general site, the Court must still address the issue of whether such prior use can serve as the basis for Marvel's claims.

tute false designation of origin in violation of 15 U.S.C. § 1125(a). (See Amended Counterclaims ¶¶ 20–23). However, as Marvel itself points out, it is well settled that the standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the same as for trademark infringement claims under Section 32 (15 U.S.C. § 1114). *See Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir. 1986) (citations omitted). Since the Court has already found that Marvel cannot establish a claim for trademark infringement, see Section I.C.2, *supra,* the Court also finds that Marvel's claim for false designation of origin must also be dismissed. Accordingly, the Court grants Fox's motion to dismiss Marvel's fourth counterclaim.

**4. Trademark Dilution**

■ Marvel's fifth counterclaim alleges dilution of a famous mark in violation of 15 U.S.C. § 1125(c). (See Amended Counterclaims ¶¶ 24–28). Marvel argues that Fox's use of the domain names diluted the X–Men mark by connecting Internet users to Fox's main web site—which, according to Marvel, has "nothing to do with the X–Men property"—and by connecting users to inactive sites. (See Marvel Memo at 15). However, contrary to the allegations contained in Marvel's counterclaims (see Amended Counterclaims ¶ 13), Fox's main web site does contain a link for the X–Men films (see Choe Decl., Exh. 4; see also www.foxmovies.com (last visited September 23, 2002)), and thus it is clearly related to Fox's promotion of those films. As discussed supra, such promotional efforts are expressly permitted by the 1993 Agreement. The mere fact that the site also contains material about Fox's other film properties does not render Fox's use of the X–Men domain names dilutive, and Marvel offers nothing, beyond the conclusory allegations in its Amended Counter-

claims, to show that the connection to Fox's main site actually dilutes the X–Men mark. Accordingly, Marvel cannot pursue its claim for dilution based on the fact that some of Fox's X–Men related domain names connect users to the main Fox site. Likewise, Marvel cannot base a dilution claim on the fact that several of Fox's X–Men related domain names do not connect to active web sites. Marvel does not explicitly state in its Amended Counterclaims or in its brief how Fox's use of those domain names dilutes its X–Men trademark, and the Court does not see how the mere presence of inactive X–Men related web sites on the Internet would cause consumer confusion or " 'reduce the public's perception that the [X–Men] mark signifies something unique, singular or particular.' " *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208 (2d Cir.1999) (quoting H.Rep. 104–374, at 3 (1995) and discussing the nature of dilution claims under the Lanham Act). As discussed supra, inactive web sites do not transmit any information to consumers, and thus it is difficult to see how these sites could affect public perception of the X–Men mark. Thus, the mere existence of these inactive sites does not provide a basis upon which Marvel can base a claim for dilution. Accordingly, the Court grants Fox's motion to dismiss Marvel's fifth counterclaim.

**5. Common Law Claims**

■ Marvel's sixth counterclaim alleges that Fox's conduct with respect to the X–Men related domain names constitutes trademark infringement, unfair competition, dilution, and misappropriation under New York state common law. (See Amended Counterclaims ¶¶ 29–32). However, as Marvel concedes, the standards for trademark infringement and dilution under New York common law are essentially the same as under the Lanham Act. (See Marvel Memo. at 16 (citing Fox

Memo); *see also Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 358 n. 18 (S.D.N.Y.1998)). Since the Court has dismissed Marvel's claims for infringement and dilution under the Lanham Act, see Section I.C.2, 4, *supra,* the Court also dismisses Marvel's common law infringement and dilution claims. The dismissal of the federal trademark claims also necessitates dismissal of the common law unfair competition claim because "the essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir.1995) (quoting *Rosenfeld v. W.B. Saunders, A Division of Harcourt Brace Jovanovich, Inc.,* 728 F.Supp. 236, 249–50 (S.D.N.Y. 1990)). As discussed *supra,* Fox's conduct with respect to the domain names did not constitute misappropriation of Marvel's labors, nor are Fox's X–Men related web sites likely to confuse or deceive consumers as to the source of the X–Men films. Those findings also necessitate the dismissal of Marvel's claim for common law misappropriation. Accordingly, the Court grants Fox's motion to dismiss Marvel's sixth counterclaim.

**D. Copyrights to the X–Men Logos**

▮ In its seventh counterclaim, Marvel seeks a declaratory judgment that would invalidate the copyright registrations obtained by Fox for its X–Men logos. (See Amended Counterclaims ¶¶ 33–41).

Marvel alleges that Fox's logos are derivative of Marvel's own copyrighted X–Men logos, and maintains that Fox obtained its copyright registrations by deliberately failing to identify its logos as derivative of Marvel's. (*Id.* ¶¶ 36, 39). However, the Court has already found that Fox's X–Men logos contain "the requisite degree of originality to be copyrightable as [ ] derivative work[s]." *See Fox v. Marvel I,* 155 F.Supp.2d at 25.[11] Thus, Fox's failure to identify its logos as derivative does not affect the validity of Fox's copyright registrations. The instant action is distinguishable from *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.,* 482 F.Supp. 980 (S.D.N.Y. 1980), case in which a registrant's knowing failure to advise the Copyright Office of a prior related work was found to constitute a basis for holding the registration invalid. *See Russ Berrie,* 482 F.Supp. at 988. In *Russ Berrie,* the court found that the latter work did not necessarily contain the requisite originality to be copyrightable as a derivative work; thus, the issue of whether the prior work should have been listed on the registration form was relevant. *See Id.* In this case, the Court has found that Fox's logos would have been copyrightable regardless of whether Fox advised the Copyright Office that its works were based on Marvel's. Thus, Marvel cannot pursue a claim that seeks to invalidate Fox's copyright registrations with respect to its X–Men logos. Accordingly, the Court grants Fox's motion to dismiss Marvel's seventh counterclaim.

11. Marvel argues that despite the Court's earlier finding regarding the originality of Fox's logo artwork, the counterclaim should not be dismissed because the issue of originality is a jury question. (See Marvel Memo. at 17–18). However, although the question of originality can be a question of fact for the jury, it is not necessarily so. When a work clearly contains sufficient originality to be copyrightable, courts may decide the issue as a matter of law. *See CMM Cable Rep. Inc. v. Ocean Coast Properties, Inc.* 97 F.3d 1504, 1517 (1996) (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 364, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)); *see also Modern Publishing v. Landoll, Inc.,* 849 F.Supp. 22, 24 (S.D.N.Y.1994).

## II. Defendants' Motion for Partial Summary Judgment

Marvel, along with defendants Tribune Entertainment Company ("Tribune"), Fireworks Communications, Inc., and Fireworks Television (US), Inc. (collectively, "Fireworks"), moves for partial summary judgment with respect to Fox's breach of contract claim. Defendants seek such judgment on the grounds that (i) the 1993 Agreement "permits Marvel to exploit a weekly *X-Men* television series without Fox's consent;" (ii) the Agreement "did not grant to Fox rights in the subsequently developed title *Mutant X;* " and (iii) "the content of the Mutant X television series, including its characters, premises, storylines, and sets is unrelated to the X–Men property, and hence falls outside the scope" of the Agreement. (Defendants' Notice of Motion for Partial Summary Judgment at 2).

### A. Legal Standard

A district court may grant summary judgment only if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All inferences and ambiguities are resolved in the non-movant's favor. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). If the moving party meets its burden, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat the motion for summary judgment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *See AGV Prods. v. Metro-Goldwyn–Mayer, Inc.,* 115 F.Supp.2d 378, 386 (S.D.N.Y.2000) (citation omitted). When reasonable minds could not differ as to the import of the proffered evidence, then summary judgment is proper. *See Anderson,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). Moreover, "conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

### B. Discussion

Defendants' base their motion for summary judgment on two arguments, each of which is discussed in turn.

#### 1. California Civil Code § 988

■ Defendants's first argument is based on California Civil Code § 988(c). They assert that under this statute all ambiguities in the 1993 Agreement's grant of rights to Fox are to be resolved in Marvel's favor. Thus, defendants contend, the Agreement's "freeze" provision, which allows Fox to preclude Marvel from making a "live-action motion picture for ... television," should be construed to apply only to long-form programs, such as "movies of the week," and not to weekly one-hour shows such as Mutant X. *See Fox v. Marvel I,* F.Supp.2d at 13–16 (finding that the 1993 Agreement was ambiguous with respect to the scope of the freeze). Defendants also maintain that by virtue of § 988(c), the Court should find that the title "Mutant X" was not part of the property granted to Fox by the Agreement. Fox argues in response that § 988 is not applicable to the 1993 Agreement, and thus cannot serve as the basis for a grant of summary judgment to defendants. Accordingly, the Court must determine whether § 988 applies to the license agreement between Fox and Marvel.

Section 988 is entitled "Ownership of physical work of art; reservation upon conveyance of other ownership rights; resolution of ambiguity." Cal.Civ.Code § 988 (West 2001). The second and third sections of the statute read as follows:

(b) Whenever an exclusive or nonexclusive conveyance of any right to reproduce, prepare derivative works based on, distribute copies of, publicly perform, or publicly display a work of art is made by or on behalf of the artist who created it or the owner at the time of the conveyance, ownership of the physical work of art shall remain with and be reserved to the artist or owner, as the case may be, unless such right of ownership is expressly transferred by an instrument, note, memorandum, or other writing, signed by the artist, the owner, or their duly authorized agent.

(c) Whenever an exclusive or nonexclusive conveyance of any right to reproduce, prepare derivative works based on, distribute copies of, publicly perform, or publicly display a work of art is made by or on behalf of the artist who created it or the owner at the time of the conveyance, any ambiguity with respect to the nature or extent of the rights conveyed shall be resolved in favor of the reservation of rights by the artist or owner, unless in any given case the federal copyright law provides to the contrary.

*Id.* Defendants argue that because the 1993 Agreement with Fox involved the conveyance of rights to prepare derivative works based on a work of graphic art, namely the X–Men comic book series, § 988(c) therefore applies to the Agreement. (See Defendants' Joint Memorandum in Support of Their Motion for Partial Summary Judgment ("Def.S.J.Memo.") at 5–7). Thus, defendants contend, the ambiguity regarding the scope of the Agreement's freeze provision should be resolved in favor of Marvel (as the owner of the X–Men property). Fox maintains that

§ 988(c) is not applicable to the 1993 Agreement because § 988(c) applies only to ambiguities regarding the ownership of a physical work of art. (See Fox Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment ("Fox S.J.Memo.") at 3). In support of that argument, Fox points to the language of § 988(b), see *supra,* as well as the legislative history of § 988 (see Declaration of Jonathan Reichman in Support of Defendants' Motion for Partial Summary Judgment ("Reichman S.J.Decl."), Exh. N), both of which indicate that the central purpose of § 988 was to prevent the unintentional transfer of physical ownership rights by artists who intend to convey only certain intellectual property rights related to their works.

No court has specifically addressed whether § 988(c) applies only to ambiguities related to the ownership of a physical work of art, or whether, as defendants contend, § 988(c) applies to all conveyances of the intellectual property rights listed in the statute. See Cal.Civ.Code § 988(c), *supra.* Thus, the Court must attempt to predict how the Supreme Court of California would answer that question. See *Elliott Associates, L.P. v. Banco de la Nacion,* 194 F.3d 363, 370 (2d Cir.1999) (noting that when the law of a state is uncertain or ambiguous, federal courts sitting in diversity must carefully predict how the highest court of the state would resolve the uncertainty or ambiguity); *see also Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 650 (2d Cir.1994) (same).

The Supreme Court of California has held that in cases involving statutory interpretation, its fundamental task is to determine the state legislature's intent, so as to effectuate the particular law's purpose. See *People v. Murphy* (2001) 25 Cal.4th 136, 142, 105 Cal.Rptr.2d 387, 19 P.3d 1129, (citing *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572, 88 Cal.Rptr.2d

19, 981 P.2d 944). Thus, the California Supreme Court begins by examining the statute's words, giving them a plain and common sense meaning, *see Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476, 66 Cal.Rptr.2d 319, 940 P.2d 906, but does not consider the statutory language "in isolation." *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299. Rather, it looks to "the entire substance of the statute ... in order to determine the scope and purpose of the provision." *West Pico Furniture Co. v. Pacific Finance Loans* (1970) 2 Cal.3d 594, 608, 86 Cal.Rptr. 793, 469 P.2d 665 (citation omitted). The words of the a particular provision are to be construed " 'in context, keeping in mind the nature and obvious purpose of the statute' " *Id.* Thus, courts must harmonize "the various parts of a statutory enactment ... by considering the particular clause or section in the context of the statutory framework as a whole." *See, e.g., Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230, 514 P.2d 1224. And if the statutory text is ambiguous, courts are free to look to extrinsic sources such as the legislative history. *See Day v. City of Fontana* (2001) 25 Cal.4th 268, 272, 105 Cal.Rptr.2d 457, 19 P.3d 1196.

When § 988(c) is considered in the context of the entire statute, it becomes clear that the ambiguity resolution provision is not applicable to the grant of rights contained in the 1993 Agreement between Fox and Marvel. The legislative history reveals that when it enacted § 988, the California legislature was primarily focused on preventing the inadvertent transfer of physical ownership rights in works of art. (See Reichman Decl., Exh. N at 37–38, 42, 53–54, *passim* ); *see also Chamberlain v. Cocola Assoc., L.A.,* 958 F.2d 282, 284 (9th Cir.1992) (reviewing legislative history). Section § 988(b) deals specifically with the effect that transfers of certain intellectual property rights have on the ownership of a physical work of art, requiring that a transfer of physical ownership rights be in writing. See Cal.Civ.Code § 988(b), supra. Thus, it is only logical to infer that § 988(c) was meant to provide guidance in the drafting and interpretation of such written ownership transfers. Indeed, it would have been illogical for the legislature to create a provision affecting rights beyond physical ownership but make such a provision a subsection of a statute focused on physical ownership rights.

The Court notes that if defendants interpretation of § 988(c) were correct the statute would create a rule of contractual construction with wide-ranging effects on intellectual property licensing in California. In effect, the statute would create a "licensor wins" rule for any ambiguous grant of rights relating to the reproduction, distribution, display, performance, or preparation of derivative works based on a work of art. And given the fact that in the twenty years since § 988 was enacted, no California court has applied § 988(c) in such a manner, this Court is reluctant to do so. *See City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415, 421 (3d Cir. 2002) (noting that it is not the role of federal courts to expand state law in ways not "foreshadowed by state precedent"). Accordingly, the Court finds that § 988(c) does not apply to the ambiguous provisions of the 1993 Agreement's freeze provision, and thus declines to find, as a matter of law, that the provision only applies to long-form motion pictures (as opposed to one-hour weekly program like Mutant X). Likewise, the Court declines to find as a matter of law that the 1993 Agreement did not grant Fox any rights with respect to the title "Mutant X."

**2. Content of Mutant X**

█ Defendants argue that even if the 1993 Agreement is interpreted to preclude Marvel from producing one-hour weekly television shows, "the content of Mutant X

is so objectively dissimilar that, as a matter of law, it does not fall within" the Agreement. (Def.S.J.Memo. at 10). Underlying that argument is defendants' contention that the standard used to determine whether Mutant X represents a breach of the 1993 Agreement is the "substantial similarity" standard used in copyright infringement actions. (See *Id.* at 16–18). Fox responds by asserting that the relevant standard for determining whether defendants have breached the freeze provision of the Agreement is less stringent than "substantial similarity." According to Fox, the relevant inquiry is whether the X–Men property was the " 'inspiration for' 'Mutant X' " (see Fox S.J.Memo at 9), and because a reasonable juror could find that Mutant X was indeed inspired by the X–Men, summary judgment should be denied. Thus, the Court is presented with a threshold question as to what standard of similarity should be applied to Fox's breach of contract action.

In support of its position, Fox cites cases in which California courts distinguished between claims of copyright infringement (which require that plaintiffs show substantial similarity) and breach of contract claims, for which the plaintiffs need only establish that defendants works were based on, or inspired by, the plaintiffs' creative material. *See Fink v. Goodson–Todman Enterprises, Ltd.*, 9 Cal. App.3d 996, 1008, 88 Cal.Rptr. 679 (Ct. App.1970); *Minniear v. Tors*, 266 Cal. App.2d 495, 72 Cal.Rptr. 287 (Ct.App. 1968). However, those cases dealt with contracts—either implied or express— whose terms were unambiguous. In *Fink*, plaintiff alleged that he had an express contract with defendants obligating defendants to pay plaintiff "if they should televise a series 'based on [p]laintiff's [p]rogram or any material contained in it.' " *Fink*, 9 Cal.App.3d at 1002, 88 Cal.Rptr. 679. In *Minniear*, plaintiff submitted a "pilot" episode of a television show, as well as outlines of several future episodes, and alleged that defendants had implicitly agreed to compensate plaintiffs if his idea "was used" by defendants. *Minniear*, 266 Cal.App.2d at 498, 504, 72 Cal.Rptr. 287. In this case there is an express contract which purports to set forth the circumstances under which Fox can preclude Marvel from producing a live-action motion picture for television, but that contract is ambiguous. As the Court has previously found, the freeze provision is ambiguous as to the length and form of the television program that Fox can preclude. *See Fox v. Marvel I*, 155 F.Supp.2d at 13–16. But it is also ambiguous with respect to the substantive content that constitutes a breach of the freeze provision. The provision simply states that although the grant of rights to Fox contained in Paragraph 6 of the Agreement does not include live-action television rights, "Marvel shall not, without Fox's prior written consent, which consent may be withheld in Fox's sole discretion, produce, distribute, or exploit or authorize the production, distribution, or exploitation of any live-action motion picture for free television exhibition, pay television exhibition, non-theatrical exhibition or home video exhibition (on cassettes or discs) . . ." (See Choe Decl., Exh. 2 at 9). It is unclear whether this provision was meant to prevent Marvel from producing a live-action television motion picture "based on," or "inspired by," the X–Men property, or whether it merely prevents Marvel from "using," i.e. appropriating, elements of the X–men property in creating a show that is substantially similar to X–Men. Thus, even though a provision precluding Marvel from producing motion pictures "based on" X–Men may be breached by the production of a show whose similarity to the X–Men property is less than "substantial," *see Fink*, 9 Cal.App.3d at 1008, 88 Cal.Rptr. 679, the Court is unable to discern whether such a provision is in fact part of the 1993 Agreement. Similar-

ly, the Court cannot find as a matter of law that the freeze provision in the Agreement merely prevents Marvel from producing live-action motion pictures for television that are substantially similar to X–Men. There exists an issue of fact as to the parties' intent in drafting this provision, and thus the Court declines to grant summary judgment.[12]

## Conclusion

For the reasons set forth above, Fox's motion to dismiss Marvel's Amended Counterclaims is granted. Defendants' motion for partial summary judgment with respect to Fox's breach of contract claim is denied.

SO ORDERED.

12. Even if the Court were to apply the more stringent "substantial similarity" standard advocated by defendants, their motion for summary judgment would be denied. Though the Court previously found that the level of similarity between the first episode of Mutant X and the X–Men property was not substantial enough to warrant the grant of a preliminary injunction, *see Fox v. Marvel I*, 155 F.Supp.2d at 28–34, such finding was made pursuant to the heightened standard of proof applied to motions for preliminary relief when the relief requested would alter the status quo. *See Id.* at 27–28 (citing *Tom Doherty Assocs. v. Saban Entertainment, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995)). The detailed comparisons between Mutant X and X–Men that were provided by the parties demonstrate that a reasonable juror could find that substantial similarities exist between the two. However, due to the existence of a threshold issue of fact, i.e. the meaning of the freeze provision of the 1993 Agreement, the Court need not examine the parties contentions with respect to the similarity of content between Mutant X and X–Men.