[No. B143112. Second Dist., Div. Eight. Dec. 5, 2002.]

GUNTHER-WAHL PRODUCTIONS, INC., et al., Plaintiffs and
Appellants, v.
MATTEL, INC., Defendant and Respondent.

28

**COUNSEL**

Esner & Chang, Stuart B. Esner; Law Offices of Nate G. Kraut and Nate G. Kraut for Plaintiffs and Appellants.

Greenberg Glusker Fields Claman Machtinger & Kinsella, Lawrence Y. Iser; Hill Farrer & Burrill and Michael K. Collins for Defendant and Respondent.

## OPINION

**COOPER, P. J.**—Appellants Gunther-Wahl Productions, Inc. (Gunther-Wahl) and Candy Wahl appeal from a judgment for respondent Mattel, Inc. (Mattel), a toy manufacturer. Appellants sued Mattel for breach of an implied-in-fact contract for allegedly using appellants' ideas for an animated television series and related toy lines, presented to Mattel in July 1993, without paying for those ideas.[1] The presentation was one regarding "Flutter Faeries;" thereafter, various Mattel dolls, including Barbie and the Polly Pocket line, appeared with characteristics plaintiffs claim were similar to the Flutter Faeries concept, thus destroying plaintiffs' opportunity to market the concept or a cartoon series based on it. The jury returned a defense verdict finding no implied-in-fact contract was formed.[2]

Appellants contest a jury instruction and the refusal to allow certain of their rebuttal evidence. Finding prejudicial instructional error, we shall reverse the judgment.

### PROCEDURAL HISTORY AND STATEMENT OF FACTS

#### *Presentation of the Flutter Faeries concept*

Michael Wahl, a successful animation executive and former practicing lawyer, had presented possible properties to Mattel in the early 1990's. In 1992, Gunther-Wahl, a "viable and respected independent animation company," started discussing a girl-oriented entertainment property; Michael first discussed the Flutter Faeries in late 1992 or early 1993 with his wife Candy. Gunther-Wahl created a presentation package for the project in June 1993.

Michael Wahl testified he met Mattel's Debra Gallinni sometime in June 1993, possibly at an industry show in New York. They had a discussion, and she asked him to come in and show Mattel what they were doing. According to Michael Wahl, she was the gatekeeper or person to contact at Mattel and said to call and set up a meeting. He believed Ms. Gallinni invited him to the

---

[1]The case proceeded to trial on theories of breach of implied contract, fraud, and unjust enrichment.

[2]The verdict was unanimous as to Candy Wahl and was nine to three as to Gunther-Wahl. That is, the jury returned a special verdict, answering nine to three, that Mattel did not enter into an implied contract with Gunther-Wahl Productions and 12 to zero that Mattel did not enter into an implied contract with Candy Wahl and did not breach an implied contract with Candy Wahl. The jury did not answer the question "Did Mattel breach its implied contract with plaintiff Gunther-Wahl?" The jury answered "0" to the question "What is the total amount of damages if any suffered by plaintiffs?"

meeting to "come in and present cartoon ideas that have ancillary toy application and merchandising ideas." According to Michael Wahl, he had "no doubt" she invited him in to pitch or present.[3] He called her on June 29, 1993, and left word on her answering machine to set up a meeting.

At her deposition, Ms. Gallinni could not recall the circumstances of how the meeting was arranged or whether Rolla Bedford was present at the July 1993 meeting. Her memory was refreshed at trial and she recalled that she was in New York for a convention when Michael Wahl approached her in a hotel lobby and indicated he was developing some properties he wanted to show her and she told him to "set up a meeting through my secretary." She also recalled at trial some details about the Flutter Faeries presentation, that Ms. Bedford was not present, and that a decision was made to present Flutter Faeries at the next girls' license acquisition meeting.

It is undisputed that a meeting between Gunther-Wahl and Mattel occurred at the Mattel offices in July 1993 and that three properties, including Flutter Faeries, were discussed. Michael Wahl understood that if Mattel liked the properties, they would enter negotiations to license and participate. More specifically, Michael Wahl testified: "Our creations are our property. You can't just take them. Generally, my understanding would be that they would have to compensate us if they took them. . . . Morally and the way our industry works. If everybody could freely take the intellectual properties of others, no one would present anything to anybody and nothing would get produc[ed] and no toys would be made. No one would show anybody anything." As he explained, a lot is spent in development; and there would be no incentive to present ideas to Mattel if he thought Mattel could take those ideas and run with them without compensating him.[4]

Michael Wahl detailed his presentation about Flutter Faeries, including what types of toys were envisioned for Mattel under a toy license. The dolls started as segmented caterpillars and changed from crystal cocoons into half-human, half-butterfly Flutter Faeries, each representing a season, with magic powers that allowed them to interact with the environment. The

---

[3]A declaration by Michael Wahl stated he ran into her and informed her he had three projects in development he wanted to present to Mattel for licensing and that she invited him to schedule a meeting for that purpose.

[4]Harriet Beck, an attorney and plaintiffs' expert relating to the customs and practice of the children's entertainment licensing industry, testified it would not be legitimate for the toy company to use information obtained in the pitch to influence or develop its own toys "if it's a copy of the toy you brought in." As she observed, "there's an ethical question about misappropriating someone else's property, rejecting it and then damaging the property of the seller that brought it in to you." According to Beck, if the materials were used without any negotiations, it would be fair to assume the normal standard industry rate of 8 percent.

clothing matched each season; and the concept included dolls, fashion, hair play, fantasy, collectability, adventure, empowerment, and romance. Visual aids demonstrated the accompanying story of the Flutter Faeries, Land of Bliss, King Oberon, Prince Devon, and the evil Queen Penumbra. The presentation also envisioned books shaped like each particular butterfly-fairy: Francesca the fall fairy with powers to control the trees and plants; Genevieve the intelligent winter fairy who could freeze the ground; Lindsey the spring fairy with the power to control flowers and animals; and Josephina the summer fairy who could control the waters. A cocoon, wands, fairy dust, life-size flutter wings with tiaras, and a wasp coach were among the accessories pitched at the meeting.

According to Michael Wahl, Mattel was "very enthusiastic" about the pitch and asked Gunther-Wahl to leave the presentation materials, which he did. Ms. Gallinni or Mr. Markman asked him to leave it so she could show it around and Mattel could evaluate it. Michael Wahl testified that none of the Mattel representatives at the meeting mentioned that Mattel had anything similar in production or stopped his presentation; nor did Mattel ask if the ideas could be used in connection with Barbie or its other products. At presentations with other entities, he would be stopped in the middle of a pitch to be told they already had a similar product; his expectation was that Mattel would do the same.[5] He would not have left the materials if Mattel said they had something similar in development.

There was no discussion of compensation at the July 7 meeting. Michael Wahl admitted he never told Mattel in words or substance that Mattel would have to pay Gunther-Wahl if the company used any part of the Flutter Faeries concept. However, no one except Mattel ever stole ideas from him, and it was not his understanding he had to have a written contract with payment terms in order to prevent someone from stealing his ideas.[6]

Flutter Faeries was put on the July 21 Mattel girls' licensing meeting agenda that described the concept. The technique at such meetings was to

[5]Plaintiffs' expert Harriet Beck concurred as to the custom and practice in the industry insofar as the pitch would usually be stopped, but not necessarily that the similarity would be revealed. She opined that the company has an obligation either to let the presenter know of the similarity, return the materials, or make some kind of an offer to license. Mattel's Ken Markman agreed that, as a matter of professional courtesy, the accepted procedure is to suggest no interest or that there is something in development if a similar product is being pitched. He admitted never telling Gunther-Wahl that people in marketing and in design would be informed about the Flutter Faeries pitch.

[6]Ken Markman, formerly senior director for entertainment and licensing at Mattel, testified that if Mattel took an idea from an entertainment property and produced toys based on that idea, "We would have to acquire the rights to that entertainment vehicle for toys, and it would be documented in a legal document." The question asked was whether Mattel "would have no obligation to compensate the person who presented that idea to Mattel unless there was a full

share information that had been presented to Mattel regarding submission of properties available for licensing. Mattel recommended tracking Flutter Faeries "as the entertainment develops." The distribution list for the meeting included people in Marketing and Design departments at Mattel, and those people could have accessed the presentation materials.[7]

Michael Wahl had lunch with Mattel's Markman on July 20 and discussed both Flutter Faeries and Young Astronauts. In this and later conversations with others at Mattel, Wahl was not told that Mattel had any similar products in production. On July 30, Rolla Bedford told Michael Wahl she "thought something was there" and the idea was really charming, and asked if there was any animation on the property. He sent an animation reel of the work his company did in early August 1993.

When Michael Wahl spoke to Rolla Bedford on October 4, she said she thought Flutter Faeries was a cute property but they would pass on it;[8] she then mentioned something to do with something they were working on. Wahl asked for the presentation materials to be returned, and she agreed. A memo dated October 8 from Markman stated the materials were being returned, but they were not returned until December 1993 with an undated cover letter from Bedford. Mattel never explained its delay. Ms. Bedford did apologize for the delay and wrote that the file "had been mistakenly put in archive."[9] Nevertheless, during discovery, Mattel still had at least part of the presentation materials. Plaintiff's expert Harriet Beck opined that "the toy company would only retain the materials if they were interested in it," the materials would be returned if the company was not interested, and there was no custom and practice to retain copies without permission from the seller.

---

negotiation and a document in writing was put together reflecting that obligation." Ms. Gallinni was unaware of any license of an entertainment property by Mattel that was not negotiated and documented in writing and believed entertainment did not have the authority to enter into a license agreement without the marketing department's approval.

[7]According to Nancy Zwiers, who had been vice-president of marketing for the Barbie toy line, people in the Barbie group discussed with entertainment the properties submitted for license or purchase. She specifically recalled talking to Rolla Bedford and Debra Gallinni about such properties. Margo Moschel, formerly vice-president of design for Barbie and vice-president of design for all girls' toys, spoke with Markman and Gallinni about properties presented to Mattel for a license or purchase and knew others in design took part in brainstorming sessions at which people from marketing were present.

[8]According to Markman and Bedford, who was the point person at Mattel for Flutter Faeries, an agenda of September 15 stated Mattel had decided not to pursue Flutter Faeries.

[9]Various Mattel employees had differing thoughts about the policy, if any, of keeping and/or returning such materials. Testimony also differed regarding when the "agendas" were received by those on the distribution list. Even the presence of various Mattel employees at the girls' licensing acquisition meeting at which Flutter Faeries was on the agenda was the subject of controversy.

The Wahls subsequently discovered that Mattel trademarked the name "Flutter Fairies" and, in their opinion, utilized several of the concepts from the July 1993 presentation and materials in toys produced by Mattel. Candy Wahl opined that if Mattel had designed various Fairy-themed names on its own, one would expect Mattel would have told Michael Wahl at the July 1993 meeting that Mattel had a fairy product.

There was conflicting evidence as to the originality of the Flutter Faeries concept and the origin of Mattel's use of some of the ideas pitched by the appellants in July 1993. Mattel produced evidence that supported its argument that Candy Wahl's Flutter Faeries concept was not unique or original. Moreover, despite inferences to the contrary, there was substantial evidence that Mattel did not borrow or steal her ideas but came up with the challenged portions, such as a fairy theme, fairy dust, flowers on dresses, the name "Flutter Fairies" and so forth, through its own design efforts and/or the efforts of others paid by Mattel. (See *Teich v. General Mills, Inc.* (1959) 170 Cal.App.2d 791, 7803-804 [339 P.2d 627] [even where showing of similarity and access raise an inference of copying, defendant can demonstrate its product was independently conceived and developed and avoid liability].) Furthermore, Mattel argued that the release of its challenged products in 1995 did not have anything to do with the rejection of the Flutter Faeries by other toy and entertainment companies in 1993 and 1994.

### Jury instructions

Mattel requested the following instruction, the giving of which with the bolded additions, presents the central issue on appeal:[10]

"In their action against Mattel for breach of an implied-in-fact contract, plaintiffs have the burden of establishing, by a preponderance of the evidence, all of the facts necessary to prove each of the following issues:

"1.   Plaintiffs made a presentation to Mattel regarding 'Flutter Faeries' **and Mattel received it;**

"2.   Before plaintiff disclosed their 'Flutter Faeries' presentation to Mattel, **under all the facts and circumstances,** plaintiffs *clearly conditioned their disclosure on Mattel's agreement to pay* Gunther-Wahl and/or Candy Wahl if it used the 'Flutter Faeries' concept or any portion of it;

"3.   Mattel knew, **or should have known, the condition** [all the conditions] upon which the disclosure was being made before disclosure was made [and had the opportunity to reject the disclosure on the terms offered];

---

[10]We have bracketed language from the original Mattel instruction not given to the jury and boldfaced the additional language given to the jury, as indicated in the reporters transcript.

"4.  Mattel voluntarily accepted the disclosure on plaintiffs' terms **and** [,] thereby impliedly [agreeing] **agreed** to pay plaintiffs **for any concepts which they might use** [if it used the 'Flutter Faeries' concept or any portion of it];

"5.  Mattel actually used plaintiffs' 'Flutter Faeries' concepts in the development of one or more [toys] **products** produced by Mattel; that is, that Mattel based a [toy] **product or products** substantially upon 'Flutter Faeries' rather than on its own ideas or ideas from other sources; and

"6.  The portion **of** the 'Flutter Faeries' concepts that Mattel used, if any, had value." (Italics added.)[11]

**"A request for a submission or the absence of a request for a submission is a factor that may be considered in deciding whether there is an implied-in-fact contract."**

Plaintiffs' motion for new trial was based on the same grounds raised on appeal. Plaintiffs' reply added that newly discovered evidence of Mattel's production of "Fairy of the Forest" dolls, allegedly designed and developed during the pendency of the instant litigation but not revealed during discovery, was an independent basis for new trial. The trial court took the motion under submission and denied the motion for new trial. This appeal from the order denying new trial, from the judgment, and from all related rulings and orders follows.

CONTENTIONS ON APPEAL

Appellants contend: 1. The trial court prejudicially erred by (a) instructing the jury that plaintiffs had to clearly condition the disclosure of their idea on

---

[11]Plaintiffs had requested the following language regarding solicitation and implied promise: "If Mattel requested that plaintiffs disclose their idea, such request or solicitation implies a promise to pay for the idea if Mattel uses it. Thus, it does not matter whether the idea is abstract, since the parties are bound by their implied contract. Therefore, plaintiffs' act of disclosing their Flutter Faeries idea, if that act was in exchange for a promise, may be consideration for Mattel's promise to pay for the idea if Mattel used it." Repeating the words of its own requested instruction, Mattel objected to plaintiffs' proposed instruction. Mattel further objected to plaintiffs' requested BAJI No. 10.56 (8th ed. 1994) regarding express or implied contracts.

Plaintiffs objected to Mattel's proposed language, claiming it described "the law pertaining to an unsolicited, 'out of the blue' submission of an idea" and not the situation where there was an invitation to submit ideas. Moreover, plaintiffs suggested four modifications to Mattel's language, including that "Plaintiff's conditioning their disclosure of ideas on Mattel's agreement to pay need not have been expressly communicated to Mattel but can be established by evidence of custom and practice in the industry" and "However, if Mattel requested that plaintiffs disclose their ideas, such a request implies a promise by Mattel to pay for the disclosure if Mattel uses the ideas."

Mattel's agreement to pay and by (b) refusing to instruct that if Mattel requested plaintiffs to submit their idea, such a solicitation implies a promise to pay. 2. The trial court prejudicially erred by refusing to allow plaintiffs to introduce rebuttal evidence directly negating Mattel's evidence that it would never have agreed to purchase plaintiffs' Flutter Faeries idea due to the attributes of that toy line.

## DISCUSSION

1. *The jury instructions were erroneous and prejudicial.*

Appellants claim that the trial court prejudicially erred by (a) instructing the jury that plaintiffs had to clearly condition the disclosure of their idea on Mattel's agreement to pay and by (b) refusing to instruct that if Mattel requested plaintiffs to submit their idea, such a solicitation implies a promise to pay.

Over appellants' objection, the trial court gave Mattel's requested instruction, though modified, that it was appellants' burden, in establishing an implied-in-fact contract, to prove that before appellants disclosed their "Flutter Faeries" to Mattel, "under all the facts and circumstances, they clearly conditioned their disclosure on Mattel's agreement to pay Gunther-Wahl and/or Candy Wahl if it used the 'Flutter-Faeries' concept or any part of it."[12] The trial court refused appellants' proposed language, that "If Mattel requested the plaintiffs disclose their idea, such request or solicitation implies a promise to pay for the idea if Mattel uses it." However, following argument by counsel, the trial court added language at the conclusion of the challenged instruction stating that "A request for submission or the absence of a request for submission is a factor that may be considered in deciding whether there is an implied in fact contract."[13] Appellants contend that the instruction given was incorrect and that the language just quoted was inadequate to correct its defective nature. As we now explain, we agree.

Mattel acknowledges on appeal that an agreement to disclose an abstract idea may be compensable, even though it lacks novelty. (See *Desny v. Wilder*

[12]Declarations by Candy Wahl and an attorney in support of appellants' new trial motion disclosed that several of the jurors had been confused by this instruction. A declaration by one of the jurors was subsequently provided and stated in part that other jurors did not completely understand the concept of implied contract and were confused by special instruction No. 6, stating "Well, Mr. Wahl didn't sign anything he didn't have a verbal agreement so Mattel didn't have to pay them for their ideas."

[13]In modifying Mattel's instruction, the trial court expressed its view that to the extent one asks for a solicitation, that factor weighs in favor of the trier of fact finding an implied contract.

(1956) 46 Cal.2d 715, 733-734 [299 P.2d 257].) But Mattel argues that an agreement to disclose such an idea must be "clearly conditioned" upon payment (*id.* at p. 739; see also *Mann v. Columbia Pictures, Inc.* (1982) 128 Cal.App.3d 628, 647 [180 Cal.Rptr. 522]) and contends that California cases "do not recognize a special rule for solicited, as opposed to unsolicited, disclosures."

Appellants did not dispute that Mr. Wahl "did not walk in and say, you will pay me money if I give you ideas." They contend that the instruction as given permitted the jury to find for Mattel if there was no *express* contract to pay, which was conceded, even though the theory of liability was breach of an implied and not express contract. Rather, relying on 4 Nimmer on Copyright (1963) The Law of Ideas, section 1605.[D], pages 16-40 to 16-41, appellants maintain that "If defendant has requested that plaintiff disclose his idea, most courts will find that such request or solicitation implies a promise to pay for the idea if defendant uses it." (Fn. omitted.) Michael Wahl's testimony that Mattel asked him to arrange to make a presentation at Mattel offices provides the factual basis for appellant's objections to the instruction as given and to appellants' requested instruction. Evidence as to Gunther-Wahl's expectations and the custom in the industry gives a factual basis to appellants' claim of implied contract. We next analyze California cases to determine if they support Nimmer and appellants' characterization of the law.[14]

The initial case cited by Nimmer, *Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 779-780 [256 P.2d 947], is not as compelling as appellants might hope. *Weitzenkorn* involves an author who sued the producers of the motion picture Tarzan's Magic Fountain, which she claimed used ideas she had submitted to them in "Tarzan in the Land of Eternal Youth." The California Supreme Court reversed a judgment of dismissal following an order sustaining a demurrer without leave to amend as to counts alleging breach of express and implied contract. The second count incorporated allegations in the breach of express contract count and additionally alleged the plaintiff submitted her composition at defendants' request for sale to, or use by them, upon payment

---

[14]*Fink v. Goodson-Todman Enterprises, Ltd.* (1970) 9 Cal.App.3d 996, 1009, footnote 16 [88 Cal.Rptr. 679], cites Nimmer's suggestion that "if an implied contract is regarded as an agreement to pay for the disclosure of an idea rather than the idea itself and a defendant has requested that the plaintiff disclose his idea, such request implies a promise to pay for the disclosure if defendant uses the idea. (§ 170.4, p. 740, and § 173.2, pp. 757-758.) He feels this is the view in California. (§ 173.1, p. 755, citing *Chandler v. Roach* [(1957)] 156 Cal.App.2d 435 [319 P.2d 776]; *Donahue v. Ziv Television Programs, Inc.,* 245 Cal.App.2d 593 [54 Cal.Rptr. 130], and *Minniear v. Tors* [(1968)] 266 Cal.App.2d 495 [72 Cal.Rptr. 287].)" Although the quoted language is helpful to appellants in that it acknowledges Nimmer with approval, the observation was not necessary to the issues raised in *Fink* and is dicta.

to her of its reasonable value. (*Id.* at pp. 780, 792.) The *Weitzenkorn* court found the second count stated a cause of action; the allegation was that plaintiff submitted her composition to defendants " 'at their special instance and request . . . for the purpose of sale to or use by defendants *upon payment to plaintiff of the reasonable value thereof* and said defendants . . . thereupon accepted submission of said literary and dramatic composition by plaintiff and retained the same and became fully familiar with the contents thereof.' " (*Id.* at p. 792, italics added.)

While the overruling of the demurrer in *Weitzenkorn* is helpful to appellants herein, the opinion assumes proof through conduct that submission of the composition was both at defendants' request *and* that it was "for the purpose of sale to or use by defendants upon payment to plaintiff of the reasonable value thereof . . . ." The claim by appellants in the case at bench, whether defendants' request for a presentation by itself amounts to conduct implying a promise to pay for the idea if defendants used it, is thus not directly reached. (See also *Kurlan v. Columbia Broadcasting System* (1953) 40 Cal.2d 799, 801-802 [256 P.2d 962], also relied upon by Nimmer [complaint alleged both "an express oral agreement" in consideration of plaintiffs submitting his radio program at defendants' request, "if they used all or any part of the program they promised to pay him its reasonable value" and an implied agreement to pay if the material was used].)

Appellants and Mattel both cite *Desny v. Wilder, supra,* 46 Cal.2d 715 and *Mann v. Columbia Pictures, Inc. supra,* 128 Cal.App.3d 628, 647, as leading cases and either rely on or attempt to distinguish them. A review of those decisions is necessary to our analysis.

The "clearly conditioned" language in the contested instruction is from *Desny v. Wilder, supra,* 46 Cal.2d 715, 738-739: "assuming legality of consideration, the idea purveyor cannot prevail in an action to recover compensation for an abstract idea unless (a) before or after disclosure he has obtained an express promise to pay, or (b) the circumstances preceding and attending disclosure, together with the conduct of the offeree acting with knowledge of the circumstances, show a promise of the type usually referred to as 'implied' or 'implied-in-fact.' [Citations.] That is, if the idea purveyor has *clearly conditioned his offer to convey the idea upon an obligation to pay for it if it is used by the offeree* and the offeree, knowing the condition before he knows the idea, voluntarily accepts its disclosure (necessarily on the specified basis) and finds it valuable and uses it, the law will either apply the objective test (discussed, *supra* . . .) and hold that the parties have made an express (sometimes called implied-in-fact) contract, or under those circumstances, as some writers view it, the law itself, to prevent fraud and unjust

enrichment, will imply a promise to compensate." (Italics added, fn. omitted; see also 4 Witkin, Summary of Cal. Law (9th ed. 1987) Personal Property, §§ 48-49, pp. 53-55.)

The *Desny* court, *Desny v. Wilder, supra,* 46 Cal.2d 715, 739, continued: "Such inferred or implied promise, if it is to be found at all, must be based on circumstances which were known to the producer at and preceding the time of disclosure of the idea to him and he must voluntarily accept the disclosure, knowing the conditions on which it is tendered. Section 1584 of the Civil Code ('[T]he acceptance of the consideration offered with a proposal, is an acceptance of the proposal') can have no application unless. the offeree has an opportunity to reject the consideration—the proffered conveyance of the idea—before it is conveyed. Unless the offeree has opportunity to reject he cannot be said to accept. [Citations.] The idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power. The law will not in any event, from demands stated subsequent to the unconditioned disclosure of an abstract idea, imply a promise to pay for the idea, for its use, or for its previous disclosure. The law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue. So, if the plaintiff here is claiming only for the conveyance of the idea of making a dramatic production out of the life of Floyd Collins he must fail unless in conformity with the above stated rules he can establish a contract to pay."

Despite restrictive language about what must be demonstrated, the *Desny* court found a possible cause of action in the summary judgment papers: "From plaintiff's testimony, . . . it does not appear that a contract to pay for conveyance of the abstract photoplay idea had been made, or that the basis for inferring such a contract from subsequent related acts of the defendants had been established, at the time plaintiff disclosed his basic idea to the secretary. Defendants, consequently, were at that time and from then on free to use the abstract idea if they saw fit to engage in the necessary research and develop it to the point of a usable script. Whether defendants did that, or whether they actually accepted and used plaintiff's synopsis, is another question. *And whether by accepting plaintiff's synopsis and using it, if they did accept and use it, they may be found to have implicitly-by the rules discussed supra, . . . agreed to pay for whatever value the synopsis possessed as a composition embodying, adapting and implementing the idea, is also a question which, upon the present summary judgment record, is pertinent for consideration in reaching our ultimate conclusion. That is, if the*

*evidence suggests that defendants accepted plaintiff's synopsis, did they not necessarily accept it upon the terms on which he had offered it? Certainly the mere fact that the idea had been disclosed under the circumstances shown here would not preclude the finding of an implied (inferred in fact) contract to pay for the synopsis embodying, implementing and adapting the idea for photoplay production."* (*Desny v. Wilder, supra,* 46 Cal.2d at pp. 739-740, italics added.)

In *Mann v. Columbia Pictures, Inc., supra,* 128 Cal.App.3d 628, 631, the appellate court affirmed the trial court's grant of judgment notwithstanding the verdict following a jury verdict of $185,000 for the plaintiff based on an implied-in-fact contract. The plaintiff contended her 29-page written format was submitted to Columbia and later used in the motion picture production Shampoo. The court concluded that the plaintiff's evidence was insufficient to infer the defendant's access to her treatment (*id.* at p. 644) or, at the least, any inference of access and use was "rebutted by clear, positive and uncontradicted evidence." (*Id.* at pp. 648, 650-651.) There was "extensive evidence" on the author's prior creation of the Shampoo screenplay (*id.* at p. 645), and the appellate court held that the plaintiff's evidence was "legally insufficient to support a recovery." (*Id.* at p. 651.)

An instruction similar to the one challenged in the case at bench was given in *Mann,* including a requirement: " '2. That before plaintiff submitted her ideas to the defendants, she *clearly conditioned her disclosure upon defendants' agreement to pay for those ideas of plaintiff's which the defendants used, if any.'* " (*Mann v. Columbia Pictures, Inc., supra,* 128 Cal.App.3d 628, 647, fn. 6, italics added.) A discussion of the understanding, express or implied, between the parties about compensation was not a basis for the *Mann* decision. ■ "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]" (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689]; accord, *People v. Banks* (1993) 6 Cal.4th 926, 945 [25 Cal.Rptr.2d 524, 863 P.2d 769].)

■ Mattel likens Gunther-Wahl to the "idea man" in *Desny v. Wilder, supra,* 46 Cal.2d 715, 738-739, who "blurts out his idea without having first made his bargain" and therefore "has no one but himself to blame for the loss of his bargaining power." Other cases clarify that Gunther-Wahl's position was not so precarious.

*Chandler v. Roach, supra,* (1957) 156 Cal.App.2d 435, 440-441, and *Minniear v. Tors, supra,* 266 Cal.App.2d 495, are similar factually to the case

at bench. The creators of the television program *Sea Hunt* were sued by the writer of a pilot entitled *Sea Divers* in *Minniear v. Tors, supra,* 266 Cal.App.2d 495. Judgment of nonsuit was reversed as to the claim for breach of implied and express contract to purchase literary material. (*Id.* at p. 496.) Appellant had produced a pilot of *Sea Divers*; Thomas Scott, a film editor of defendant Ziv, cut and edited the film at Ziv facilities. At the request of the pilot's director, the appellant granted permission for defendant Tors, an experienced producer who had worked with the film editor, to see the film at a private showing of the pilot. (*Id.* at p. 498.) Tors watched the pilot; said he felt it contained an excellent idea; and asked the director "where do you go from here," to which the director replied there were several follow-up ideas for an entire season and referred to a specific idea. The appellant gave Tors a booklet with the outline of future series. A month after seeing the pilot, Tors began production of *Sea Hunt*, hired the appellant's underwater photographer, and attempted to hire the appellant's leading man. (*Ibid.*) Thereafter, Tors purchased for Ziv from the appellant's coventurer a story that had been related to Tors at the pilot screening and used it in the premiere of *Sea Hunt.* (*Id.* at p. 498-499.)

Appellant Minniear's contention in the contract case, much like the case at bench, was that while there was no express contract with Ziv to pay for *Sea Divers*, "there was an implied contract, and it is understood in the industry that when a showing is made, the offeror shall be paid for any ideas or material used therein." (*Minniear v. Tors, supra,* 266 Cal.App.2d at p. 500.) After reviewing pertinent California authority, the *Minniear* court concluded, 266 Cal.App.2d at page 504: "Here there is substantial evidence in the record for the jury to infer a reasonable expectation by appellant that the defendant Ziv might buy the idea for a TV underwater series in the spring of 1956. It is not necessary that the seller should definitely state that he is selling his merchandise to the prospective buyer. The agreement of sale may be inferred by the circumstances. (*Desny v. Wilder, supra.*)

"If Ziv used appellant's ideas and the other elements of a contract were satisfied, the objective test set forth in *Desny, supra,* would justify a jury verdict for appellant. [¶] There is substantial evidence to support an inference that appellant submitted his idea to Tors with the reasonable expectation he would be paid by Ziv if his idea was used. There is also sufficient evidence to support the further inference that Tors acting for Ziv accepted the submission of the idea with full awareness of appellant's expectation of payment in the event of use. [¶] Tors admitted that pilots are made in the industry for the purpose of showing them to prospective purchasers with a view to selling them commercially to make a series. The jury could infer that

Tors was more than a social guest at the showing of the pilot; that he accepted the showing and offer of the synopsis with full knowledge of the conditions and circumstances of disclosure. Tors' presence with Ziv employees at the April 11 showing, plus his request to appellant for the mimeographed format of future series, make it apparent that Ziv was interested in the SEA DIVERS pilot and future possibilities of production of such a series. In May of 1956, appellant left the film for delivery to the Ziv vice-president in charge of syndication. It was not returned to appellant for more than a year." Given the similarities in the two series, the court concluded a jury could infer appellant's ideas and format were the inspiration for *Sea Hunt* and that defendant Ziv used appellant's ideas and format and reversed the nonsuit as to the contract action. (*Minnier v. Tors, supra,* 266 Cal.App.2d at pp. 506-507.)

The court in *Chandler v. Roach, supra,* 156 Cal.App.2d 435, 436, also reversed a judgment in favor of the defendants in an action for breach of contract based on the defendants' using the plaintiff's ideas and scripts for a television series based on the activities of the public defender's office. There, the writer and producer actually got to the point of drafting written contracts; but none was signed, and the producer never paid the writer for his ideas or services although producing a series of 69 television programs "along the lines suggested by [plaintiff writer]." (*Id.* at p. 438.) The plaintiff argued that he submitted the idea of a public defender series to the producer "under such circumstances that [he] expected the idea to be paid for if used and that [the producer] expected to pay for the idea if used." (*Ibid.*)

Reversal in *Chandler v. Roach* was based on instructions that incorrectly required "novelty" and "concreteness' in order for there to be a contract to pay for an idea. (*Chandler v. Roach, supra,* 156 Cal.App.2d 435, 439, 442-443.) Nevertheless, the language regarding the essential elements of an implied-in-fact contract are instructive and are intertwined with the discussion of why novelty and concreteness are not necessary to the cause of action. "The assent of the producer is manifested by his acceptance of the idea or material submitted under the circumstances, a part of which is that it is reasonably understood that a professional author expects payment of the reasonable value of the idea or the material, if used, so that the conduct of the producer in accepting it implies a promise to fulfill those reasonable expectations." (*Chandler v. Roach, supra,* 156 Cal.App.2d 435, 441.) Moreover, "We believe that if a producer obligates himself to pay for the disclosure of an idea, whether it is for protectible or unprotectible material, in return for a disclosure thereof he should be compelled to hold to his promise. There is nothing unreasonable in the assumption that a producer

would obligate himself to pay for the disclosure of an idea which he would otherwise be legally free to use, but which in fact, he would be unable to use but for the disclosure." (*Id.* at pp. 441-442.)

In reviewing the pertinent cases, Mattel finds *Faris v. Enberg* (1979) 97 Cal.App.3d 309, 319 [158 Cal.Rptr. 704], and *Aliotti v. R. Dakin & Co.* (9th Cir. 1987) 831 F.2d 898, to be strikingly similar to the case at bench. Plaintiff in *Faris, supra,* 97 Cal.App.3d 309, 314-315, revealed his idea for a sports quiz show to announcer Enberg in hopes Enberg would be interested in being an emcee or participating in production of the show. The court found no evidence plaintiff " 'expected, or indicated his expectation of receiving compensation for the service of revealing the format to Enberg' " but voluntarily submitted it to Enberg " 'for the sole purpose of enabling Enberg to make a determination of his willingness to enter into a future business relationship with plaintiff.' " (*Id.* at p. 318.) Unlike the case at bench, where Gunther-Wahl expected payment, there was "no evidence the plaintiff expected Enberg to pay, and thus, Enberg could not be charged with such an awareness that plaintiff himself did not have." (*Id.* at p. 319.)[15]

Similarly, in *Aliotti v. R. Dakin & Co., supra,* 831 F.2d 898, 902, the affidavits in support of summary judgment demonstrated that the plaintiff made her presentation to the defendant "not to sell her [dinosaur] designs herself but to help persuade Dakin to buy Favorite Things," the plaintiff's employer before it became bankrupt. Thus, even though the presentation may have been similar to that in the case at bench, sending materials to Dakin at Dakin's request and meeting with Dakin executives (though at Favorite Things' office), summary judgment for Dakin was upheld on the implied-in-fact contract claim where there was no expectation of payment for the designs, the presentation of which was intended to help persuade Dakin to buy Favorite Things. (*Id.* at p. 902.)

Given the particular record in the case at bench, where Mattel clearly invited Gunther-Wahl to make a presentation at Mattel headquarters (whether or not at Michael Wahl's initial request), the instruction as given incorrectly forced the jury to find against plaintiffs unless they *"clearly conditioned* their disclosure on Mattel's agreement to pay . . . if it used the

---

[15]Thus, the *Faris* court, *Faris v. Enberg, supra,* 97 Cal.App.3d 309, 319, distinguished *Thompson v. California Brewing Co.* (1957) 150 Cal.App.2d 469, 473, footnote 4 [310 P.2d 436], which found sufficient allegations of implied contract that " 'at the special instance and request of defendant, plaintiff submitted to defendants . . . orally and in writing, a new and novel idea . . . , such idea being submitted . . . with the expectation, which was fully and clearly understood by defendants, that plaintiff would be compensated for its use by defendants when and if the defendants should use it.' "

'Flutter Faeries' concept or any portion of it." The jury could easily interpret that language to require an express oral or written representation of compensation, which the law does not require for an implied contract.

Bolstering that interpretation of the instruction was Mattel's counsel's argument to the jury that "plaintiffs must prove they informed Mattel, they expected to be paid not just for the master toy license, but if Mattel used any of the individual, generic elements of Flutter Faeries. Michael Wahl's own testimony negates this element, his own admission. Michael Wahl testified that he did not tell Mattel prior to beginning the July 7 pitch meeting that Mattel would have to pay a royalty . . . ." In arguing no liability without an express agreement, the absence of which is conceded, Mattel utilized the instructions in a manner that is contrary to California law. The contested instruction improperly permitted such an argument.

The language added by the trial court, that "A request for a submission or the absence of a request for a submission is a factor that *may* be considered in deciding whether there is an implied-in-fact contract" (italics added), helps, but does not cure the defect. A request for submission under the particular facts in the case at bench *must* be part of the consideration in deciding whether there is an implied-in-fact contract. If Nimmer is correct, such a request mandates a finding of implied-in-fact-contract for compensation for use, if any, of the pitched materials. Even if Nimmer has mischaracterized California law, the instruction as given did not correctly instruct the jury on the law of implied-in-fact contract given the facts in the record before us. The error was prejudicial under the standard of review set forth in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 579-581 [34 Cal.Rptr.2d 607, 882 P.2d 298]. (See also *Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1423 [107 Cal.Rptr.2d 50] [" 'Instructional error in a civil case is prejudicial " '[w]here it seems probable' " that the error prejudicially affected the verdict. [Citation.] It is not enough that there may have been a "mere possibility" of prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].) As the *Soule* court put it, the determination of prejudice depends heavily on "the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury . . . ." ' [Citation.]"].)

2.   *We need not decide if there was prejudicial error in the trial court's refusal to allow plaintiffs to introduce rebuttal evidence directly negating Mattel's evidence regarding its experts' opinions that Flutter Faeries was not a concept Mattel would have agreed to purchase.*

■     The trial court prohibited appellants from introducing rebuttal evidence to refute testimony by Mattel's witnesses. The proffered evidence was

offered to demonstrate that, contrary to its testimony that Mattel never would have used the toy ideas in question because of specific design attributes, Mattel actually produced a toy line with those same design features.

Lili Ane Davidson was called as an expert by Mattel; she had worked as a toy designer at Mattel from 1986-1996, working on the "whole gamut of girls toys." She reviewed the Flutter Faeries pitch materials and binder from Gunther-Wahl regarding the claimed similarities and opined there were "no unique characteristics in Flutter Faeries." Rather, in her opinion, the supposedly unique characteristics could be found in at least three Mattel toy lines from before 1993.

Ms. Davidson testified that the execution of Flutter Faeries as a toy line "is derivative. It's full of inconsistencies. It does not have a feature to play with and is aesthetically not very pleasing and has inconsistencies that way too." She could "actually say for sure that no designer at Mattel considering their skills, imagination and goals to make the most beautiful things in the world for Barbie would ever get anything out of the Lindsey doll," which she described as "not very attractive and does not make a lot of sense from a design point of view." Regarding the Genevieve doll, she mentioned the "lovely light layers" on Mattel dolls as opposed to (in counsel's words) "the laughable layers" on the Genevieve doll created for Flutter Faeries. She testified the dress was "too heavy to fly."

Plaintiffs claimed to have discovered during trial a Mattel Cabbage Patch Kids series with a seasonal theme. They sought to introduce evidence of the characteristics of that line in rebuttal and impeachment, to demonstrate that Mattel did produce seasonal collections for children, contrary to the testimony of Mattel experts that children would not like seasonal themes. The trial court sustained objections to the reference to those dolls. Later, plaintiffs made an offer of proof regarding the dolls, which were seasonal butterfly fairies that were not "light and airy," contrary to Ms. Davidson's view of how flying dolls should look. Counsel argued that everything Ms. Davidson said "is contradicted by these dolls and it really prejudices the plaintiffs not to show the jury that Mattel, itself thinks a lot of the elements which Ms. Davidson ridiculed and said were laughable; show, in fact, these were viable children's toys."

Mattel objected that this was not new evidence in that Candy Wahl was asked about these dolls in her deposition and allegedly said these were not Flutter Faeries or anything like them. The court was "not persuaded" by the offer of proof. Its initial ruling was based in part on Mattel's representation

that Candy Wahl was asked about these dolls during her deposition and thus plaintiffs were aware of them.[16]

After the defense rested, plaintiffs offered testimony by Michael Wahl about the Cabbage Patch dolls without showing the dolls themselves "because it directly responds to what Miss Davidson says." The court again denied the request, concluding "It's not rebuttal of Miss Davidson. Completely different items, completely different thing, completely different category. . . . It's not rebuttal. It's not relevant. I've given you every opportunity to make the record. I reconsidered once. I reconsidered twice. I read some deposition transcript. I looked at the dolls. It's not coming in. I don't see the relevancy of it. It's not rebuttal. It wasn't provided in discovery."

We conclude that the proffered evidence was at least tangentially relevant to demonstrate possible discrepancies in Ms. Davidson's analysis of the Flutter Faeries line. Given our reversal on instructional grounds, we need not decide if exclusion of the rebuttal evidence was prejudicial error. Upon retrial, if any, plaintiffs can offer to produce this evidence as part of their case-in-chief.

## DISPOSITION

The judgment is reversed. Costs on appeal are awarded to appellants.

Rubin, J., and Boland, J., concurred.

A petition for a rehearing was denied January 6, 2003, and respondent's petition for review by the Supreme Court was denied February 19, 2003.

---

[16]The court noted that if she was not questioned about these Cabbage Patch dolls with wings and/or said she knew about them, the court could change its ruling. The court gave counsel an opportunity to review Candy Wahl's deposition. After the deposition was found, the court decided not to change its ruling, stating "this is a completely different line of ideas, completely different concept. She admits it's not hers. If it was something you want to use you should have disclosed it. End of argument. End of discussion on this issue."